Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com
*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHKAN FARAZMAND, derivatively on behalf of FARADAY FUTURE INTELLIGENT ELECTRIC INC. f/k/a PROPERTY SOLUTIONS ACQUISITION CORP., | Case No.: |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| CARSTEN BREITFELD, ZVI GLASMAN, WALTER J. MCBRIDE, JORDAN VOGEL, AARON FELDMAN, YUETING JIA, EDUARDO ABUSH, DAVID AMSTERDAM, MATTHIAS AYDT, CHAOYING DENG, EDWIN GOH, BRIAN KROLICKI, LEE LIU, AYI SAVAR, SUSAN SWENSON, SCOTT VOGEL, JIAWEI WANG, and QING YE, | |
| Defendants, | |
| and | |
| FARADAY FUTURE INTELLIGENT ELECTRIC INC. f/k/a PROPERTY SOLUTIONS ACQUISITION CORP., | |
| Nominal Defendant. | |

Verified Shareholder Derivative Complaint

Plaintiff Ashkan Farazmand ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Faraday Future Intelligent Electric Inc. f/k/a Property Solutions Acquisition Corp. ("Faraday" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Eduardo Abush ("Abush"), David Amsterdam ("Amsterdam"), Aaron Feldman ("Feldman"), Ayi Savar ("Savar"), and Jordan Vogel ("J. Vogel") (collectively, the "PSAC Defendants"), and Carsten Breitfeld ("Breitfeld"), Zvi Glasman ("Glasman"), Walter J. McBride ("McBride"), Matthias Aydt ("Aydt"), Chaoying Deng ("Deng"), Edwin Goh ("Goh"), Yueting Jia ("Jia"), Brian Krolicki ("Krolicki"), Lee Liu ("Liu"), Susan Swenson ("Swenson"), Scott Vogel ("Vogel"), Jiawei Wang ("Wang"), and Qing Ye ("Ye") (collectively with the PSAC Defendants, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Faraday, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; against the PSAC Defendants for violating Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); against Defendants Breitfeld, Feldman, Glasman, Jia, McBride, and J. Vogel for contribution under Sections 10(b) and 21D of the Exchange Act; and against Defendants Aydt, Breitfeld, Deng, Glasman, Jia, Krolicki, Wang, and Ye (collectively, the "Legacy FF Defendants") for aiding and abetting the PSAC Defendants' breaches of fiduciary duty. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Faraday, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed from January 28, 2021 through November 15, 2021, inclusive (the "Relevant Period"), by Faraday's directors and officers and by the directors or officers of FF Intelligent Mobility Global Holdings Ltd. ("Legacy FF").

2.    Legacy FF, a California-based automobile start-up company, was founded in 2014 with the purpose of designing and engineering smart electric connected vehicles.

3.    Property Solutions Acquisition Corp. ("PSAC") was founded in February 2020 as a blank check company, or special purpose acquisition company ("SPAC"). PSAC had its initial public offering ("IPO") on July 24, 2020. Simultaneously, it consummated a private placement of certain units. As a result of the transactions conducted in connection with the IPO, PSAC raised gross proceeds of $229,775,680.

4.    On January 28, 2021, PSAC and Legacy FF issued a joint press release announcing that they had entered into an agreement to effect a business combination pursuant to which a subsidiary of PSAC would merge with and into Legacy FF, with Legacy FF surviving as a wholly owned subsidiary of PSAC (the "Merger").

5.    On June 24 2021, PSAC filed a proxy statement/consent solicitation statement/prospectus with the SEC (the "Proxy Statement"), in which the Board solicited PSAC stockholder approval of the Merger and in which Legacy FF's board of directors solicited Legacy FF shareholders for approval of the Merger. Shareholders of both companies approved the Merger, which closed on July 21, 2021. The combined Company changed its name to Faraday Future Intelligent Electric Inc.

6.    Throughout the Relevant Period, the Individual Defendants materially misrepresented the Company's business standing and prospects by touting Legacy FF's purported advantages, the Merger, and Faraday's progress toward commercializing

Verified Shareholder Derivative Complaint

vehicles.

7.      The Individual Defendants' misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock throughout the Relevant Period.

8.      The truth began to emerge on October 7, 2021, when J Capital Research ("J Capital") issued a report (the "Report") alleging, *inter alia*, that the Company was unlikely to ever sell a car, that the Company or Legacy FF had "reneged on promises to build factors," was being sued by unpaid suppliers, and had failed to disclose that certain assets in China had been frozen by courts. Furthermore, the Report alleged that the Company had misled the investing public by claiming it had received 14,000 deposits for vehicles, revealing that 78% of the reservations were made by a single undisclosed entity that was a likely affiliate of the Company. The Report also alleged that former engineering executives did not believe the Company's vehicles were anywhere close to production, despite the Company's statements to the contrary in in September 2021.

9.      On this news, the price of the Company's common stock fell $0.35 per share, or approximately 4.2%, from its closing price on October 6, 2021, to close at $8.05 per share on October 8, 2021.

10.     On November 15, 2021, the Company announced that it could not timely file its quarterly report on Form 10-Q for the fiscal period ended September 30, 2021. Faraday also announced that the Company's Board of Directors (the "Board") had formed a special committee of independent directors (the "Special Committee") to "review allegations of inaccurate disclosures."

11.     On this news, the price of the Company's common stock fell $0.28 per share, or approximately 3.2%, from its closing price of $9.11 per share on November 15, 2021, to close at $8.83 per share on November 16, 2021.

12.     On February 1, 2022, the Company announced the findings of the Special Committee's investigation into inaccurate disclosures. Among other findings, the Special

Committee concluded that: (1) certain statements made in connection with the Merger describing Defendant Jia's role within the Company were "inaccurate"; (2) the Company's statements leading up to the Merger regarding 14,000 reservations for the FF 91 were "potentially misleading" because only several hundred of those reservations were paid, while others were unpaid indications of interest; (3) the Company's internal controls over financial accounting and reporting require an upgrade in personnel and systems; and (4) the Company's corporate culture failed to sufficiently prioritize compliance. As a result, the Special Committee recommended fourteen enhancements to oversight and corporate governance.

13.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of Operating Faraday.[1] Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Operating Faraday was not as close to producing vehicles as it claimed; (2) courts had frozen some of Operating Faraday's assets in China; (3) despite claiming to have received 14,000 reservations for the FF 91, only several hundred of Operating Faraday's reservations were paid, while the others were unpaid indications of interest; (4) a material portion of Operating Faraday's deposits for future vehicle deliveries were attributable to a single, undisclosed affiliate; (5) as a result of the foregoing, the Company would be unable to file its quarterly report for the fiscal period ended September 30, 2021; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's and Legacy FF's public statements were materially false and misleading at all relevant times.

14.     The Individual Defendants failed to correct and/or caused the Company to fail

---

[1] The term "Operating Faraday" is sometimes used herein to refer collectively to the Company following the Merger and to Legacy FF as it existed prior to the Merger.

Verified Shareholder Derivative Complaint

to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

15.     The PSAC Defendants breached their fiduciary duties by causing the Company to acquire Legacy FF in the Merger, despite that: (1) Legacy FF was not as close to producing vehicles as it claimed; (2) courts had frozen some of Legacy FF's assets in China; (3) despite claiming to have received 14,000 reservations for the FF 91, only several hundred of Legacy FF's reservations were paid, while the others were unpaid indications of interest; and (4) a material portion of Legacy FF's deposits for future vehicle deliveries were attributable to a single, undisclosed affiliate. The PSAC Defendants knew or should have known of these issues, however they breached their fiduciary duties by effecting the acquisition on terms that, in light of the issues with Legacy FF, were unfavorable (the "Overpayment Misconduct").

16.     The PSAC Defendants breached their fiduciary duties by failing to timely file PSAC's quarterly report for the quarter ended March 31, 2021. Defendant McBride and the current members of the Company's Board breached their fiduciary duties to the Company by failing to timely file the Company's quarterly report for the quarter ended September 30, 2021.

17.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls. As stated in the Company's Form 10-Q filed on August 13, 2021, "[d]ue solely to the events that led to the Company's restatement of its December 31, 2020 financial statements on May 27, 2021, *management has identified a material weakness in internal controls related to the accounting for our Private Warrants.*" (Emphasis added.)

18.     The Legacy FF Defendants aided and abetted the PSAC Defendants' breaches of fiduciary duties.

19.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former Chief Executive Officer ("CEO"), its current Chief Financial Officer

("CFO"), its former CFO, the founder of Operating Faraday, and the Company's two former Co-CEOs  to a securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), and further subjected the Company to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

20.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Breitfeld's and Defendant J. Vogel's liability in the Securities Class Action, of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## **JURISDICTION AND VENUE**

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

Verified Shareholder Derivative Complaint

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     Venue is proper in this District because Faraday's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

26.     Plaintiff is a current shareholder of Faraday. Plaintiff has continuously held Faraday common stock at all relevant times.

### Nominal Defendant Faraday

27.     Faraday is a Delaware corporation with its principal executive offices at 18455 S. Figueroa Street, Gardena, CA 90248. Faraday's common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "FFIE."

### Defendant Breitfeld

28.     Defendant Breitfeld served as Legacy FF's CEO from September 2019 until the Merger, and continued in that role at the Company after the consummation of the Merger. He reports directly to Defendant Swenson, the Company's Executive Chairperson. In addition, he was a member of Legacy FF's Board of Directors and is a member of the post-Merger Board. He currently serves as a member of the Board's Finance and Investment Committee. According to a current report filed by the Company on Form 8-K with the SEC on July 22, 2021 (the "July 22, 2021 8-K"), as of July 21, 2021, Defendant Breitfeld beneficially owned 573,122 shares of Company common stock. Given that the price of the Company's common stock was $13.78 when markets closed on July 21, 2021, Defendant Breitfeld beneficially owned approximately $7.47 million worth of Faraday stock.

29.     According to the Proxy Statement, Defendant Breitfeld's base salary

increased to $2.25 million in connection with the Merger, although he received a salary reduction of 25% in connection with the Special Committee's investigation. He also received a lump sum bonus equal to the amount by which his base salary was reduced (to $1.8 million) from September 2019 until the Merger. In addition, he receives corporate housing (or a monthly housing allowance), an option to purchase 13 million shares of Company stock, and a signing and retention bonus of $1.2 million, which vested in part in August 2020 and August 2021 and which will fully vest on August 2022.

30.     Defendant Breitfeld is a manager of FF Global Partners LLC ("FF Global"), which, as of the date of the Proxy Statement, controlled Pacific Technology Holding LLC ("Pacific") and thereby held 29.1% of Legacy FF's share capital. Pacific indirectly controls FF Top Holding LLC f/k/a FF Top Holding Ltd.("FF Top"), which held 121,438,964 shares of the Company's common stock as of July 21, 2021, or approximately 37.4%.

31.     The Company's Proxy Statement stated the following about Defendant Breitfeld:

> ***Dr. Carsten Breitfeld*** has served as FF's Global Chief Executive Officer since September 2019. Dr. Breitfeld is a veteran in the automotive industry and had held various positions with BMW Group for approximately 20 years, including serving as its Group Vice President and Head of the i8 Vehicle Program, which gave birth to the i8 luxury plug-in hybrid model. From July 2016 to January 2019, Dr. Breitfeld was the Chief Executive Officer and Chairman of the Board of BYTON, a Chinese electric vehicle startup with operations in multiple countries and cofounded by Dr. Breitfeld. Dr. Breitfeld received his PhD degree in Mechanical Engineering from the University of Hannover.
>
> Dr. Breitfeld is well-qualified to serve on the New FF's board of directors based on his extensive executive experience in the automotive industry and his experience with FF and service as FF's Global Chief Executive Officer.

**Defendant Glasman**

32.     Defendant Glasman served as Legacy FF's CFO from December 2020 until the Merger, and he continued serving as CFO at the Company until October 27, 2021. He remained employed as a senior advisor to the Company through December 31, 2021, and

agreed to provide consulting services to the Company as an independent contractor until February 15, 2022. According to the July 22, 2021 8-K, as of July 21, 2021, Defendant Glasman beneficially owned 89,490 shares of Company common stock. Given that the price of the Company's common stock was $13.78 when markets closed on July 21, 2021, Defendant Glasman beneficially owned approximately $1.23 million worth of Faraday stock.

33.     According to the Proxy Statement, Defendant Glasman's annual base salary increased from $320,000 to $600,000 effective April 1, 2021 (with a $70,000 true-up payment). Furthermore, he received a transaction bonus of $400,000 upon the consummation of the Merger.

34.     The Proxy Statement stated the following about Defendant Glasman:

**Mr. Zvi Glasman** has served as FF's Chief Financial Officer since December 2020. From August 2013 to October 2019, Mr. Zvi served as the Chief Financial Officer of Fox Factory Holding Corp. (Nasdaq: FOXF) ("Fox Factory"), a publicly traded company that designs, engineers, manufactures and markets performance-defining products and systems for customers worldwide, primarily used on bikes, side-by-side vehicles, ATVs, snowmobiles, motorcycles, automotive, and other off-road and on-road recreational vehicles. Mr. Zvi first joined Fox Factory as the Chief Financial Officer of its subsidiary which he served from January 2008 until August 2013, and led Fox Factory's initial public offering in 2013. Prior to joining Fox Factory, Mr. Glasman held CFO roles with several companies from 2001 to 2008. Mr. Glasman is an inactive certified public accountant. He earned a Bachelor of Science degree in Finance from Pennsylvania State University in 1985.

### Defendant McBride

35.     Defendant McBride was the Company's CFO on November 1, 2021 through March 1, 2022. He previously served as CFO at Iteris Inc., SRS Labs, Inc., and Capstone Green Energy Corp.

36.     According to the Company's Form 8-K filed on November 2, 2021, which announced Defendant McBride's appointment to the position of CFO, Defendant McBride's annual base salary is $330,000, and he is eligible for a discretionary annual

performance bonus of up to $170,000. Additionally, Defendant McBride received restricted stock unit awards with an aggregate grant date fair value of $2.5 million, granted in $500,000 annual increments.

37.    The Company's November 2, 2021 Form 8-K further stated the following about Defendant McBride:

> Mr. McBride, age 69, has served as chief financial officer of the following three publicly traded companies: (i) Iteris Inc. (NASDAQ: ITI), a provider of smart mobility infrastructure management solutions, from December 2013 to July 2014; (ii) SRS Labs, Inc. (NASDAQ: SRSL), a leader in audio signal processing and enhancement technology using innovative software solutions, from October 2011 until the acquisition of the company by DTS, Inc. in July 2012; and (iii) Capstone Green Energy Corp. (NASDAQ: CGRN), a designer and manufacturer of microturbine technology for stationary power generation, cogeneration and hybrid electric vehicles, from 2005 to 2008. From 2013 until his appointment as the Company's Chief Financial Officer, Mr. McBride served as Managing Director and Chief Financial Officer of Orange County Financial Services LLC, where he specialized in raising capital for startups of disruptive technology licensing, accounting control systems, strategic financial planning, mergers and acquisitions research, business development and operating efficiencies. Mr. McBride also served as the chief financial officer of Synthetic Genomics, Inc., a company dedicated to developing and commercializing genomic driven solutions to address global energy and environmental challenges, from 2008 until March 2011. Prior to that, Mr. McBride served as the chief financial officer and in various senior executive management positions with several private and public companies. Mr. McBride holds a Bachelor of Science degree in Accounting and Finance from The Ohio State University and a Master of Science degree in Computer Systems Management from Rochester Institute of Technology.

**Defendant J. Vogel**

38.    Defendant J. Vogel served as PSAC's Chairman and Co-CEO from its inception until the Merger, when he joined the Company's Board. He became Lead Independent Director of the Board following the Special Committee's investigation. He is a member of the Compensation Committee. In addition, he is a managing member of Property Solutions Acquisition Sponsor, LLC ("Sponsor"). According to the July 22, 2021

8-K, as of July 21, 2021, Defendant J. Vogel beneficially held 5,173,732 shares of Company common stock, which consisted of Sponsor's shares of common stock and private warrants exercisable for shares of common stock. Given that the price of the Company's common stock was $13.78 when markets closed on July 21, 2021, Defendant J. Vogel beneficially held approximately $71.29 million worth of Faraday stock.

39.     According to the Proxy Statement, Defendant J. Vogel receives annual cash retainers of $50,000 for his service as a director, $6,250 for his service on the Compensation Committee, and an annual restricted stock unit award of $150,000. In connection with this appointment to the position of Lead Independent Director following the Special Committee's investigation, Defendant J. Vogel became entitled to an additional $27,500 annual retainer.

40.     The Proxy Statement stated the following about Defendant J. Vogel:

*Mr. Jordan Vogel* has served as PSAC's Chairman, Co-Chief Executive Officer and Secretary since its inception, and upon consummation of the Business Combination, will serve as a member of New FF's board of directors. Mr. Vogel has been actively investing in and managing residential real estate in New York City since 2001. Since April 2009, Mr. Vogel has served as Co-Founder and Managing Member of Benchmark Real Estate Group, LLC, a real estate investment company. Mr. Vogel oversees all of the firm's acquisitions and is a member of its Investment Committee. Prior to founding Benchmark, Mr. Vogel worked at SG2 Properties, LLC, heading their acquisitions group from 2004 to 2009. Prior to SG2, Mr. Vogel worked at William Moses Co., Inc., an owner-operator of luxury apartments in Manhattan, from 2002 to 2004. He was responsible for asset management and the day-to-day operation of the entire portfolio. Mr. Vogel began his career in private equity in 2000 at Cramer Rosenthal McGlynn, LLC, a $5 billion money management firm located in New York City. Mr. Vogel graduated with a B.S. in Economics from the University of Pennsylvania and received an M.S. in Real Estate Development from New York University.

Mr. Vogel is well-qualified to serve on the New FF's board of directors due to his investment experience and special purpose acquisition company experience.

**Defendant Feldman**

41.    Defendant Feldman served as PSAC's Co-CEO and Treasurer from its inception.  In addition, he is a managing member of Sponsor. According to the July 22, 2021 8-K, as of July 21, 2021, Defendant Feldman beneficially held 5,173,732 shares of Company common stock, which consisted of Sponsor's shares of common stock and private warrants exercisable for shares of common stock. Given that the price of the Company's common stock was $13.78 when markets closed on July 21, 2021, Defendant Feldman beneficially held approximately $71.29 million worth of Faraday stock.

42.    The Company's annual report filed on Form 10-K with the SEC on March 31, 2021 (the "2020 10-K") stated the following about Defendant Feldman:

> ***Aaron Feldman*** has served as our Co-Chief Executive Officer and Treasurer since our inception. Since October 2020, Mr. Feldman has also served as Co-Chief Executive Officer and Treasurer of Property Solutions Acquisition Corp. II. Mr. Feldman has been actively investing in and managing residential real estate in New York City since 2004. Since April 2009, Mr. Feldman has served as Co-Founder and Managing Member of Benchmark Real Estate Group, LLC. Mr. Feldman is in charge of the firm's capital markets, overseeing all investor relations, and is on the firm's Investment Committee. Prior to founding Benchmark, Mr. Feldman worked at SG2, heading its Manhattan Property and Asset Management Group and overseeing a portfolio of 700 apartments with a value of $300 million. He was directly responsible for investment performance, which included all aspects of redevelopment, construction, revenue and expense management, marketing and leasing. Mr. Feldman graduated with a B.S. in Management from Tulane University and is an active member of the Tulane University Dean's Advisory Board and National Campaign Council. He was inducted into Tulane's Athletic Hall of Fame in 2011 for his accomplishments as a member of the baseball team. Mr. Feldman actively participates in several charities, including ReThink Food and Restoration NY.
>
> We believe Mr. Feldman is well-qualified to serve as a member of our board of directors due to his experience in the real estate industry and his contacts and relationships.

**Defendant Jia**

43.    Defendant Jia is the Founder of Legacy FF. He served as Legacy FF's Chief

Product and User Ecosystem Officer from September 2019 until the Merger and continued in that role at the Company following the Merger. Defendant Jia is the uncle of Defendant Wang. In connection with the Special Committee's investigation and findings, Defendant Jia now reports directly to Defendant Swenson, who serves as the Company's Executive Chairperson.

44.     Defendant Jia is also a manager of FF Global, which, as of the date of the Proxy Statement, controlled Pacific and thereby held 29.1% of Legacy FF's share capital. Pacific indirectly controls FF Top, which held 121,438,964 shares of the Company's common stock as of July 21, 2021, or approximately 37.4%.

45.     The Proxy Statement stated the following about Defendant Jia:

> ***Mr. Yueting Jia (YT Jia)*** is the Founder of FF and has served as FF's Chief Product and User Ecosystem Officer since September 2019. In 2003, YT Jia founded Xbell Union Communication Technology (Beijing) Co., a Singapore publicly-listed company that developed and launched China's first mobile video streaming software system. In 2004, YT Jia founded LeTV, a video streaming website. In 2011, YT Jia founded Le Holdings Co. Ltd ("LeEco"), which is an internet ecosystem technology company with business segments including smart phones, smart TV, smart cars, internet sports, video content, internet finance and cloud computing. In 2014, YT Jia founded FF and was its Chief Executive Officer until September 2019. YT Jia defined and led the team in creating the FF 91. As Chief Product and User Ecosystem Officer, YT Jia oversees activities in product innovation, strategy and definition; internet, AI and autonomous driving; user experience, user acquisition and user operation and will report directly to the New FF board of directors. YT Jia completed master's degree courses in enterprise management from Shan Xi University and attended the China CEO Program jointly offered by Cheung Kong Graduate School of Business, Columbia Business School, IMD and London Business School.

**Defendant Abush**

46.     Defendant Abush served as a director of PSAC from February 2020 until the Merger. Defendant Abush is a member of Sponsor.

47.     The 2020 10-K stated the following about Defendant Abush:

***Eduardo Abush*** has served as a member of our board of directors since February 2020. He has also served as a member of the board of directors of Property Solutions Acquisition Corp. II since March 2021. Mr. Abush has served as Managing Partner and Portfolio Manager of Waterfront Capital Partners LLC, a hedge fund based in New York City, since he founded the firm in January 2013. Previously, Mr. Abush was a Portfolio Manager at Millennium Partners LLC (New York) from 2005 to 2013 and a Senior Analyst at Zimmer Lucas Partners LLC from 2003 to 2005. Mr. Abush graduated Suma Cum Laude and received his BA in Economics from the Instituto Tecnologico Autonomo de Mexico and an MBA from Stanford University-Graduate School of Business.

We believe Mr. Abush is well-qualified to serve as a member of our board of directors due to his experience in the real estate industry and his contacts and relationships

### Defendant Amsterdam

48.     Defendant Amsterdam served as a director of PSAC from February 2020 until the Merger. Defendant Amsterdam is a member of Sponsor.

49.     The 2020 10-K stated the following about Defendant Amsterdam:

***David Amsterdam*** has served as a member of our board of directors since February 2020. He has also served as a member of the board of directors of Property Solutions Acquisition Corp. II since March 2021. Mr. Amsterdam has served as President — Investments and Eastern Region and Co-Head of US Capital Markets for Colliers International, a publicly traded real estate services and investment management firm, since March 2018. His responsibilities include advising investors, corporate users and landlords across the full spectrum of commercial real estate transactions. Prior to Colliers International, Mr. Amsterdam worked with real estate executive, Paul Massey, on his New York City mayoral campaign in 2017. Mr. Amsterdam previously served in various positions with Cushman & Wakefield from 2005 to 2011 and SL Green Realty Corp. from 2011 to 2016. While with SL Green, Mr. Amsterdam was responsible for structuring and negotiating lease transactions for a portfolio of 10 million square feet of trophy Class A assets and routinely completed nearly 100 transactions per year. He implemented redevelopment, repositioning and strategic upgrading programs throughout the portfolio and assisted with equity and structured finance investments, acquisitions and dispositions and joint ventures. He graduated with a B.A. in Political Science from Syracuse University.

We believe Mr. Amsterdam is well-qualified to serve as a member of our board of directors due to his experience in the real estate industry and his contacts and relationships.

**Defendant Aydt**

50.     Defendant Aydt served as Legacy FF's Senior Vice President of Business Development and Product Definition from November 2019 until the Merger and has continued to serve in that role at the Company following the Merger. He served also as a director of Legacy FF prior to the Merger and is currently a member of the Company's Board. According to the July 22, 2021 8-K, as of July 21, 2021, Defendant Aydt beneficially owned 272,984 shares of Company common stock. Given that the price of the Company's common stock was $13.78 when markets closed on July 21, 2021, Defendant Aydt beneficially owned approximately $3.76 million worth of Faraday stock.

51.     According to the Proxy Statement, Defendant Aydt's base salary is $400,000 and he is eligible to receive a discretionary annual performance bonus (with a target amount of $100,000).

52.     Defendant Aydt is a manager of FF Global, which, as of the date of the Proxy Statement, controlled Pacific and thereby held 29.1% of Legacy FF's share capital. Pacific indirectly controls FF Top, which held 121,438,964 shares of the Company's common stock as of July 21, 2021, or approximately 37.4%. As of the date of the Proxy Statement, Defendant Aydt held 7,332,000 membership units in FF Global.

53.     The Proxy Statement stated the following about Defendant Aydt:

***Mr. Matthias Aydt*** has served as FF's Senior Vice President of Business Development and Product Definition since November 2019, overseeing business development of FF's business to business sales, technology licensing and strategic cooperation as well as leading its product strategy for future products. Mr. Aydt has served in various leadership roles at FF, including Senior Vice President of Product Execution, Vice President of Vehicle Engineering and Vehicle Chief Engineer and Head of Hardware Architecture. Mr. Aydt has extensive experience in the automotive industry. Prior to joining FF in July 2016, Mr. Aydt served as the Vice President of

16

Verified Shareholder Derivative Complaint

Vehicle Engineering of Qoros Auto from January 2015 to May 2016, held various positions at Magna Steyr from 2006 to 2014, including Branch Manager and Head of Project Management at Magna Steyr China. Mr. Aydt received his Bachelor of Science degree from Fachhochschule Ulm - Hochschule für Technik.

Mr. Aydt is well qualified to serve on the New FF's board of directors based on his extensive executive experience in the automotive industry and with FF and his strategic and technical background.

**Defendant Deng**

54.     Defendant Deng is currently the Company's Chief of Staff, Vice President of corporate Operations, Vice President of Government Affairs and Administration. She previously served as Legacy FF's Vice President of Administration from April 2014 until the Merger, and was also a member of Legacy FF's Board of Directors.

55.     Defendant Deng is a manager of FF Global, which, as of the date of the Proxy Statement, controlled Pacific and thereby held 29.1% of Legacy FF's share capital. Pacific indirectly controls FF Top, which held 121,438,964 shares of the Company's common stock as of July 21, 2021, or approximately 37.4%.

**Defendant Goh**

56.     Defendant Goh has served as a Company director since the Merger. In addition, he serves as Chair of the Finance and Investments Committee and as a member of the Audit Committee.

57.     According to the Proxy Statement, Defendant Goh receives annual cash retainers of $50,000 for his service on the Board, $7,500 for his service as Chair of the Finance & Investments Committee, and $10,000 for his service as a member of the Audit Committee, in addition to an annual restricted stock unit award of $150,000.

58.     The Proxy Statement stated the following about Defendant Goh:

***Mr. Edwin Goh***. Upon consummation of the Business Combination, Mr. Goh will serve as a member of New FF's board of directors. Mr. Goh has extensive experience in finance and strategy in the Technology, Media and Telecommunications (TMT) sector. Currently, he is a Senior Advisor to Cebile Capital, a private advisory firm. Prior to that, Mr. Goh worked for

17

Verified Shareholder Derivative Complaint

Barclays Investment Bank in Europe and Asia for over 10 years and most recently served as the Head of Asia Pacific TMT. Before joining Barclays, he worked at Goldman Sachs in London and Bain & Company in Singapore and Los Angeles. Mr. Goh received his MBA degree from The Wharton School, University of Pennsylvania. He also holds a Masters of Engineering in Civil Engineering from Imperial College, University of London.

Mr. Goh is well-qualified to serve on the New FF board of directors based on his skills and experiences in finance and consulting and knowledge of the technology and internet industry.

**Defendant Krolicki**

59.     Defendant Krolicki served on Legacy FF's Board of Directors prior to the Merger and was appointed to the Board of the Company upon the consummation of the Merger. He served as Chairman of the Board and as Chair of the Nominating and Corporate Governance Committee until the conclusion of the Special Committee's investigation, following which he stepped down from those roles and became a member of the Audit and Compensation Committees of the Board. According to the July 22, 2021 8-K, as of July 21, 2021, Defendant Krolicki beneficially owned 103,620 shares of Company common stock. Given that the price of the Company's common stock was $13.78 when markets closed on July 21, 2021, Defendant Krolicki beneficially owned approximately $1.43 million worth of Faraday stock.

60.     According to the Proxy Statement, Defendant Krolicki receives annual cash retainers for $50,000 for his service on the Board, $10,000 for his service as a member of the Audit Committee, and $6,250 for his service as a member of the Compensation Committee, in addition to an annual restricted stock unit award of $150,000.

61.     The Proxy Statement stated the following about Defendant Krolicki:

***Mr. Brian K. Krolicki***. Upon consummation of the Business Combination, Mr. Krolicki will serve as a member and Chairman of New FF's board of directors. Mr. Krolicki sat on the advisory board of FF from June 2019 to April 2020 and has been a director of FF since May 2020. Mr. Krolicki has extensive experiences in both the public and private sectors, and has served as a director or member of the advisory board in various companies. Mr. Krolicki was the Lieutenant Governor of the State of Nevada from 2007 to 2014 and

the State Treasurer of the State of Nevada from 1999 to 2006. Mr. Krolicki also served in a wide variety of critical positions, including Chairman of the Nevada Commission on Economic Development and President of the Nevada State Senate. During his tenure as State Treasurer, Nevada became the first state treasury to receive the Certificate of Excellence in Investment Policy. In 2004, Brian was honored with the prestigious Award for Excellence in Public Finance and, in the same year, earned the distinction the nation's "Most Outstanding State Treasurer." Mr. Krolicki sits on the boards of Vislink Technologies Inc. (Nasdaq: VISL), and Nevada Nanotech Systems (and is currently its chairman of the audit committee). He is also the director of government relations of Customer Engagement Technologies, a payment solutions company in partnership with JPMorgan Chase. Mr. Krolicki holds a B.A. degree in Political Science from Stanford University.

Mr. Krolicki is well-qualified to serve on the New FF's board of directors based on his directorship experience with various companies, governance experience from his public service careers and extensive experience in the financial and technology industries.

**Defendant Liu**

62.    Defendant Liu was appointed to the Company's Board upon the consummation of the Merger. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee.

63.    According to the Proxy Statement, Defendant Liu receives annual cash retainers of $50,000 for his service on the Board, $10,000 for his service as Chair of the Compensation Committee, and $6,250 for his service as a member of the Compensation Committee, in addition to an annual restricted stock unit award of $150,000.

64.    The Proxy Statement stated the following about Defendant Liu:

***Mr. Lee Liu***. Upon consummation of the Business Combination, Mr. Liu will serve as a member of New FF's board of directors. Mr. Liu has extensive experiences in human resource, social capital and organizational capital management. Currently, Mr. Liu serves as founder and Chief Executive officer of King Maker Company (KMC) and Chairman of China Intelligent Management Association, a national society focusing on human resource development. Prior to founding KMC as well as CIMA in May 2020, Mr. Liu served as Senior Vice President of Human Resources at Baidu Inc., and the Chairman of Baidu Cloud Business. Prior to joining Baidu in April 2011,

Mr. Liu served a variety of management roles in Motorola Inc. across regions and countries, including the Vice President of Global Human Resources. Mr. Liu received his PhD degree in Economics from Southwestern University of Finance and Economics. He also holds an Executive MBA degree from Peking University and a Bachelor degree in Microelectronis from Tianjin University.

Mr. Liu is well-qualified to serve on the New FF board of directors based on his extensive background in technology and internet services and human resources management.

**Defendant Savar**

65.    Defendant Savar served as a director on PSAC's Board from February 2020 until the Merger. Defendant Savar is a member of Sponsor.

66.    The 2020 10-K stated the following about Defendant Savar:

*Avi Savar* has served as a member of our board of directors since February 2020. He has also served as a member of the board of directors of Property Solutions Acquisition Corp. II since March 2021. Over the last two decades, Mr. Savar has helped leading organizations drive change by leveraging digital as a transformative force to build and grow their brands. In March 2011, Mr. Savar established Hyper Focus LLC (formerly Savar Ventures), an advisory and investment firm, and also joined venture capital firm Dreamit Ventures, where he currently serves as Partner and Board Director. Mr. Savar was named President of consumer intelligence platform SUZY, Inc. in February 2018. In 2004, Mr. Savar founded Big Fuel, a global digital marketing agency, which he grew from a one-man shop to an industry leader with over 130 employees worldwide. Over the following years, Big Fuel consulted with some of the world's leading brands, including American Express, GM, Budweiser, Samsung, Gatorade, Colgate-Palmolive, Fisher-Price, Weight Watchers, AFLAC, T-Mobile and Carnival Cruises. Big Fuel was acquired by Publicis Group in 2011. Mr. Savar is the author of Content to Commerce: Engaging Consumers Across Paid, Owned and Earned Channels (published by Wiley in 2013) and was named the inaugural President of the Cannes Lions Branded Content Jury in 2010. Mr. Savar is a director of Arccos Golf and sits on advisory boards for American Express, DCP Midstream and AgAge's Publisher's Council. Mr. Savar graduated with a BS in Communications from Boston University.

We believe Mr. Savar is well-qualified to serve as a member of our board of directors due to his experience in the real estate industry and his contacts and

relationships.

**Defendant Swenson**

67.   Defendant Swenson was appointed to the Company's Board upon the consummation of the Merger, and began serving as Chair of the Audit Committee and as a member of the Compensation Committee. Following the Special Committee's investigation and findings, Defendant Swenson stepped down from the Audit and Compensation Committees and was appointed to the newly created position of Executive Chairperson of the Company.

68.   As Executive Chairperson of the Company, Defendant Swenson is entitled to a monthly base salary of $100,000 and was awarded stock options for a number of shares equal to $3 million divided by the January 31, 2022 stock price, subject to certain vesting provisions.

69.   The Company's February 1, 2022 Form 8-K announcing Defendant Swenson's appointment to the position of Executive Chairperson of the Company stated the following about Defendant Swenson:

> Ms. Swenson has served on the Board since July 2021. She has several decades of senior level operating experience in technology-related industries, including wireless telecom, video technologies, digital media, telematics and small business software. Since March 2019, Ms. Swenson has served on the board of directors of Sonim Technologies Inc. (NASDAQ: SONM), and currently chairs its compensation committee. Since July 2018, Ms. Swenson has served on the board of directors of Vislink Technologies, Inc. (NASDAQ: VISL), a provider of wireless video communications products, where she is board chair and chair of the audit committee. Since February 2012, Ms. Swenson has served on the board of directors of Harmonic, Inc. (NASDAQ: HLIT), a video delivery and media company, where she is chair of its governance and nominating committee. From August 2012 to August 2018, Ms. Swenson served on the board of directors of FirstNet, an independent authority within the NTIA/Department of Commerce responsible for establishing a single nationwide public safety broadband network, and was chair of the board from 2014 to 2018. From December 2015 to June 2017, Ms. Swenson served as Chairperson and Chief Executive Officer of Inseego Corporation (formerly Novatel Wireless; NASDAQ: INSG), a wireless

internet solutions and telematics provider, and served as the board chairperson from April 2014 to June 2017. From February 2004 to October 2005, Ms. Swenson served as the President and Chief Operating Officer of T-Mobile US, Inc. From 1999 to 2004, Ms. Swenson served as President of Leap Wireless International, Inc. ("Leap"), and Chief Executive Officer of Cricket Communications, Inc., a prepaid wireless service provider and subsidiary of Leap. Ms. Swenson also served as Chief Executive Officer of Sage North America from 2008 to 2011. Ms. Swenson previously served on the board of directors of Wells Fargo from November 1994 to December 2017. Ms. Swenson received a B.A. in French from San Diego State University.

**Defendant S. Vogel**

70.    Defendant S. Vogel was appointed to the Company's Board upon the consummation of the Merger. Defendant S. Vogel is the brother of J. Vogel, who was Chairman and Co-CEO of PSAC prior to the Merger. Following the Special Committee's investigation and findings, Defendant S. Vogel became the Chair of the Audit Committee and the Nominating and Corporate Governance Committee of the Board.

71.    According to the Proxy Statement, Defendant S. Vogel receives an annual cash retainer of $50,000 for his service on the Board, in addition to an annual restricted stock unit award of $150,000. As Chair of the Audit Committee and Nominating and Corporate Governance Committee, he is entitled to annual cash premiums of $15,000 and $7,500, respectively.

72.    The Proxy Statement stated the following about Defendant S. Vogel:

***Mr. Scott D. Vogel.*** Upon consummation of the Business Combination, Mr. Vogel will serve as a member of New FF's board of Directors. Mr. Vogel has served as the Managing Member at Vogel Partners LLC, a private investment and advisory firm, since July 2016. From 2002 to July 2016, Mr. Vogel served as Managing Director at Davidson Kempner Capital Management. From 1999 to 2001, he worked at MPF Investors, L.L.C. Prior to MPF Investors, he was an investment banker at Chase Securities, Inc. Mr. Vogel has served on numerous boards during his career, including the board of Seadrill Ltd. from July 2018 to February 2020, Arch Coal, Inc. from October 2016 to May 2019 and Key Energy Services, Inc. from December 2016 to April 2019. Currently, Mr. Vogel serves on the board of directors of the following public companies: Alpha Metallurgical Resources, Inc. since

December 2019, CBL & Associates Properties, Inc. since October 2020, Avaya Holdings Corp. since December 2017, and Bonanza Creek Energy since April 2017. Mr. Vogel received his Master of Business Administration Degree from The Wharton School at the University of Pennsylvania and his Bachelor's degree in Business Administration from Washington University.

Mr. Vogel is well-qualified to serve on the New FF board of directors due to his mix experience with executive management oversight, finance and capital markets, human resources and compensation, and strategic planning.

**Defendant Wang**

73.     Defendant Wang served as Legacy FF's Vice President of Global Capital Markets from May 2018 until the Merger and continued to lead the Capital Markets Department at the Company following the Merger. In addition, he was a director of Legacy FF prior to the Merger. Defendant Wang is the nephew of Defendant Jia. On February 1, 2022, the Company announced that Defendant Wang was suspended without pay in connection with the Special Committee's investigation into inaccurate statements by the Company. As of March 1, 2020—prior to his suspension without pay—Defendant Wang's annual base salary increased to $380,000, according to the Proxy Statement.

74.     According to the July 22, 2021 8-K, as of July 21, 2021, Defendant Wang beneficially owned 1,265,904 shares of Company common stock. Given that the price of the Company's common stock was $13.78 when markets closed on July 21, 2021, Defendant Wang beneficially owned approximately $17.44 million worth of Faraday stock.

75.     Defendant Wang is a manager of FF Global, which, as of the date of the Proxy Statement, controlled Pacific and thereby held 29.1% of Legacy FF's share capital. Pacific indirectly controls FF Top, which held 121,438,964 shares of the Company's common stock as of July 21, 2021, or approximately 37.4%.

76.     The Proxy Statement stated the following about Defendant Wang:

*Mr. Jiawei Wang* has served as FF's Vice President of Global Capital Markets since May 2018. Prior to that, Mr. Wang was the General Manager of China Capital Markets at FF from March 2017 to January 2018 and Global Head of Capital Markets from January 2018 to May 2018. Before joining FF,

Mr. Wang worked at LeEco as Director of Corporate Development from 2015 to 2017. He co-founded Global Galaxy Inc. in September 2013 and worked as a private equity analyst at Knights Investment Group from December 2013 to February 2014. Mr. Wang received his Bachelor Degree in Finance from Central University of Finance and Economics.

**Defendant Ye**

77.    Defendant Ye joined Legacy FF in February 2018 and served as its Vice President of Business Development until the Merger. Upon the consummation of the Merger, Defendant Ye became a Company director and continued serving as Vice President of Business Development. He serves as a member of the Finance and Investment Committee. According to the July 22, 2021 8-K, as of July 21, 2021, Defendant Ye beneficially owned 163,270 shares of Company common stock. Given that the price of the Company's common stock was $13.78 when markets closed on July 21, 2021, Defendant Ye beneficially owned approximately $2.25 million worth of Faraday stock.

78.    According to the Proxy Statement, Defendant Ye's base salary is $300,000 and he is eligible to receive a discretionary annual performance bonus (with a target of $100,000). As of the date of the Proxy Statement, Defendant Ye held 3,632,700 membership units in FF Global. As of the date of the Proxy Statement, FF Global controlled Pacific and thereby held 29.1% of Legacy FF's share capital. Pacific indirectly controls FF Top, which held 121,438,964 shares of the Company's common stock as of July 21, 2021, or approximately 37.4%.

79.    The Proxy Statement stated the following about Defendant Ye:

***Mr. Qing Ye.*** Upon consummation of the Business Combination, Mr. Ye will serve as a member of New FF's board of directors. Mr. Ye joined FF in February 2018 and currently serves as FF's Vice President of Business Development and FF PAR. Mr. Ye also served as a director of Faraday Future from September 2018 to February 2020. Prior to joining FF, Mr. Ye served as the Vice President of Smart Device Overseas at LeEco from November 2016 to May 2017, and President of LeEco U.S. from May 2017 to February 2018, as a member of the board of directors of Lucid Motors from September 2017 to August 2018, and as a Country GM/MD of Huawei Consumer BG at Huawei France from January 2014 to October 2016. Mr. Ye received his

Master degree in Electronics Engineering from Zhongshan University and his Bachelor degree in Engineering and Administration from Huazhong Science and Technology University.

Mr. Ye is well-qualified to serve on the New FF board of directors due to his extensive leadership experience in electric vehicle and technology companies.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

80.    By reason of their positions as officers, directors, and/or fiduciaries of Faraday and because of their ability to control the business and corporate affairs of Faraday, the Individual Defendants owed Faraday and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Faraday in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Faraday and its shareholders so as to benefit all shareholders equally.

81.    Each director and officer of the Company owes to Faraday and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

82.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Faraday, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

83.    To discharge their duties, the officers, and directors of Faraday were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

84.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein

involves a knowing and culpable violation of their obligations as directors and officers of Faraday, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

85. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

86. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Faraday were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California, Delaware, New York, and the United States, and pursuant to Faraday's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Faraday conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Faraday and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Faraday's operations would comply with all applicable laws and Faraday's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

87.    Each of the Individual Defendants further owed to Faraday and the shareholders the duty of loyalty requiring that each favor Faraday's interest and that of its

shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

88.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Faraday and were at all times acting within the course and scope of such agency.

89.     Because of their advisory, executive, managerial, directorial, and controlling positions with Faraday, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

90.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Faraday.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

91.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties. In particular, prior to the Merger, the Legacy FF Defendants aided and abetted the PSAC Defendants' breaches of fiduciary duty.

92.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Legacy FF's and the Company's operations, financial condition, legal compliance, future business prospects,

Verified Shareholder Derivative Complaint

and internal controls; and (iii) artificially inflate the Company's stock price.

93.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Furthermore, certain of the Individual Defendants, acting in concert, caused PSAC to engage in the Overpayment Misconduct. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is or was a director of PSAC or the post-Merger Company was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

94.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In particular, the Legacy FF Defendants aided and abetted the PSAC Defendants' breaches of fiduciary duty in engaging in the Overpayment Misconduct. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

95.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Faraday, and was at all times acting within the course and scope of such agency.

## THE COMPANY'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### PSAC's Code of Ethics

96.    PSAC's Code of Ethics (the "PSAC Code"), attached as an exhibit to PSAC's Registration Statement on Form S-1 filed with the SEC on July 2, 2020, provides that it applies "to all directors, officers, and employees of the Company."

97.   The PSAC Code provides that it has the intent to:

- promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- promote the full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC"), as well as in other public communications made by or on behalf of the Company;
- promote compliance with applicable governmental laws, rules, and regulations;
- deter wrongdoing; and
- require prompt internal reporting of breaches of, and accountability for adherence to, this Code.

98.   Under the heading "Honest, Ethical and Fair Conduct," the PSAC Code provides as follows:

Each person owes a duty to the Company to act with integrity. Integrity requires, among other things, being honest, fair, and candid. Deceit, dishonesty, and subordination of the Company's interests to personal interests are inconsistent with integrity. Service to the Company should never be subordinated to personal gain or advantage.

99.   Under the same heading, the PSAC Code provides that each person must, *inter alia*: (1) "Act with integrity, including being honest and candid while still maintaining the confidentiality of the Company's information where required or in the Company's interests"; (2) "Refrain from taking advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice"; and (3) "Protect the assets of the Company and ensure their proper use."

100.   Under the heading "Disclosure," the PSAC Code provides as follows:

The Company strives to ensure that the contents of and the disclosures in public communications and in the reports and documents that the Company files with the SEC shall be full, fair, accurate, timely, and understandable in accordance with applicable disclosure standards, including standards of materiality, where appropriate. Each person must:

- not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators, self-regulating organizations, and other governmental officials, as appropriate; and

- in relation to his or her area of responsibility, properly review and critically analyze proposed disclosure for accuracy and completeness.

101. Under the heading "Compliance," the PSAC Code provides as follows:

It is the Company's obligation and policy to comply with all applicable governmental laws, rules, and regulations. It is the personal responsibility of each person to, and each person must, adhere to the standards and restrictions imposed by those laws, rules, and regulations, including those relating to accounting and auditing matters.

***Faraday's Code of Conduct***

102. The Company's current Code of Conduct states that it describes standards of conduct for all employees, officers, consultants, and independent contractors of the Company (collectively, "Company Personnel") as well as directors.

103. The Code of Conduct provides that its purpose is as follows:

The purpose of this Code is to deter wrongdoing and to promote: (i) honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, (ii) full, fair, accurate, timely and understandable disclosure in our Securities and Exchange Commission reports and other public communications, (iii) compliance with applicable laws, rules and regulations, (iv) prompt internal reporting of violations of this Code to appropriate persons identified in this Code and (v) accountability for adherence to this Code.

104. Under the heading "Conflicts of Interest," the Code of Conduct provides that "Company Personnel and directors are expected to dedicate their best efforts to the business of the Company and to avoid any conflicts with the interests of the Company."

105. Under the heading "Protection and Proper Use of Company Assets," the Code of Conduct provides as follows:

We each have a duty to protect the Company's assets and ensure their efficient

use. Theft, carelessness and waste have a direct impact on the Company's profitability. We should take measures to prevent damage to and theft or misuse of Company property. When an individual leaves the Company, all Company property must be returned to the Company. Incidental and occasional personal use of the Company's electronic mail and telephone systems is permitted. However, please be aware that even personal messages on the Company's computer and telephone systems are Company property and individuals therefore have no expectation of personal privacy in connection with their use of these resources, except as specifically authorized in this Code or elsewhere.

106.   Under the heading "Company Books and Records," the Code of Conduct provides as follows:

All Company documents must be completed accurately, truthfully and in a timely manner, including all travel and expense reports. When applicable, documents must be properly authorized. The Company's financial activities must be recorded in compliance with all applicable laws, regulations, contract terms and conditions, and accounting practices. The making of false or misleading entries, records or documentation is strictly prohibited. Company Personnel and directors must never create a false or misleading report or make a payment or establish an account on behalf of the Company with the understanding that any part of the payment or account is to be used for a purpose other than as described by the supporting documents.

107.   Under the heading "Internal Accounting Controls and Procedures for Financial Reporting," the Code of Conduct provides as follows:

The Company's policy is to maintain a system of internal accounting controls to ensure reliability and adequacy of the Company's books and records and proper recording of all transactions including dispositions of assets. The Company has adopted and implemented internal accounting controls, procedures and records to ensure, among other things, the flow of information from all levels of the Company to the Company's Chief Financial Officer and the Chief Executive Officer. Full, fair, accurate, timely and understandable disclosure is required in all financial reports of the Company.

108.   Under the same heading, the Code of Conduct provides, in relevant part, that "[i]t is the primary responsibility of the Audit Committee to oversee internal accounting controls, policies and procedures."

***PSAC's Audit Committee Charter***

109.   PSAC's Audit Committee Charter, attached as an exhibit to PSAC's Registration Statement on Form S-1 filed with the SEC on July 2, 2020, provided that the purposes of the PSAC Audit Committee were to assist PSAC's Board of Directors in monitoring the following:

> (1) the integrity of the annual, quarterly, and other financial statements of the Company, (2) the independent auditor's qualifications and independence, (3) the performance of the Company's independent auditor, and (4) the compliance by the Company with legal and regulatory requirements.

110.   PSAC's Audit Committee Charter stated that the PSAC Audit Committee shall "[r]eview and discuss with management and the independent auditor the annual audited financial statements." The charter similarly stated that the PSAC Audit Committee shall "[r]eview and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements."

111.   The PSAC Audit Committee Charter also charged the PSAC Audit Committee with discussing with management and the independent auditor any significant financial reporting issues relating to the preparation of the Company's financial statements, including "any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies."

112.   The PSAC Audit Committee Charter provided that the PSAC Audit Committee shall "[e]stablish procedures . . . for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or reports which raise material issues regarding the Company's financial statements or accounting policies."

113.   In addition, the PSAC Audit Committee Charter provided that the PSAC Audit Committee shall:

> Review and approve all payments made to the Company's officers and directors or its or their affiliates. Any payments made to members of the Audit Committee will be reviewed and approved by the Board, with the interested

director or directors abstaining from such review and approval.

***Faraday's Audit Committee Charter***

114.   Faraday's Audit Committee Charter states that the purpose of the Audit Committee "is to assist the Board in its oversight of the Company's accounting and financial reporting processes and the audit of the Company's financial statements."

115.   Faraday's Audit Committee Charter states that the Audit Committee shall: "Meet to review and discuss the annual audited financial statements and quarterly financial statements with management and the Independent Auditor, including the disclosures under the caption 'Management's Discussion and Analysis of Financial Condition and Results of Operations.'"

116.   Faraday's Audit Committee Charter further state that the Audit Committee shall take the following actions with respect to the Company's financial reporting processes and internal controls:

> Review the Company's financial reporting processes and internal controls, based on consultation with the Independent Auditor and Internal Audit. Such review shall include a consideration of major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of identified deficiencies. Review any analyses prepared by management and/or the Independent Auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

117.   Faraday's Audit Committee Charter also tasks the Audit Committee with monitoring ongoing internal audit activities, stating that the Audit Committee shall:

> Review and assess the annual internal audit plan, the process used to develop the plan and the status of activities, significant findings, recommendations and management's response. Monitor ongoing Internal Audit activities by reviewing and discussing with management reports and other communications prepared by Internal Audit.

118.   In violation of the PSAC Code, the PSAC Audit Committee Charter, and

PSAC's corporate governance documents, the PSAC Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act and the aiding and abetting thereof. Also in violation of PSAC's corporate governance documents, the PSAC Defendants failed to maintain the accuracy of PSAC records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the PSAC Code. Furthermore, the PSAC Defendants failed to timely file PSAC's quarterly report for the quarter ended March 31, 2021 and failed to maintain internal controls.

119.   In violation of Faraday's Code of Conduct, the Audit Committee Charter, and the Company's corporate governance documents, the Individual Defendants who were at the Company following the Merger conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and the aiding and abetting thereof. Also in violation of the Company's corporate governance documents, the Individual Defendants who joined the post-Merger Company failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Furthermore, they failed to maintain internal controls.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

120.   PSAC, a blank check company, or SPAC, had its initial public offering on July 24, 2020. It the offering, PSAC sold 20,000,000 of its units at a price of $10.00 per

unit, generating gross proceeds of $200 million. The IPO and certain other transactions conducted in connection with the IPO resulted in PSAC netting approximately $229.78 million in gross proceeds.

121.   On January 28, 2021, electric vehicle start-up company, Legacy FF, and PSAC announced their entry into a definitive agreement to merge. The resulting Merger was consummated on July 21, 2021.

122.   Pursuant to the Merger Agreement, outstanding shares of Legacy FF and outstanding Legacy FF converting debt were converted into shares of PSAC common stock and, for FF Top Holdings Ltd. ("FF Top"), shares of PSAC's Class B common stock.

123.   However, both prior to and after the Merger, which was consummated on July 21, 2021, the Individual Defendants made or caused Legacy FF, PSAC, and/or the post-Merger Company to make materially false and misleading statements that concealed issues with Legacy FF and the resulting implications for the business combination and the Company. As a result, the Company's stock price was artificially inflated throughout the Relevant Period.

124.   Moreover, the PSAC Defendants engaged in the Overpayment Misconduct by causing PSAC to acquire Legacy FF despite numerous issues with Legacy FF, and certain of the Individual Defendants failed to timely file the Company's quarterly reports on Form 10-Q with the SEC.

125.   In addition, the Individual Defendants failed to maintain internal controls at the Company. Specifically, in the Company's Form 10-Q filed on August 13, 2021, the Company disclosed that, "[d]ue solely to the events that led to the Company's restatement of its December 31, 2020 financial statements on May 27, 2021, management has identified a material weakness in internal controls related to the accounting for our Private Warrants."

**Failure to Timely File SEC Reports**

126.   During the Relevant Period, certain of the Individual Defendants breached their fiduciary duties by failing to timely file required reports with the SEC, including the

Company's quarterly reports on Form 10-Q.

127.   Specifically, on May 14, 2021, the PSAC Defendants breached their fiduciary duties to the Company by failing to timely file PSAC's quarterly report on Form 10-Q for the quarter ended March 31, 2021. As a result, PSAC filed a Form 12b-25 notifying that it was unable to file its quarterly report for the quarter ended March 31, 2021.

128.   Additionally, Defendant McBride and the Board breached their fiduciary duties to the Company by failing to file the Company's quarterly report on Form 10-Q for the quarter ended September 30, 2021. As a result, on November 15, 2021 the Company filed a Form 12b-25 notifying that it was unable to file its Form 10-Q for the quarter ended September 30, 2021, and further notified that it was unable to file a Form 8-K with the Company's third quarter 2021 earnings press release, or its amended Registration Statement on Form S-1.

**<u>Overpayment Misconduct</u>**

129.   Prior to the Merger, Legacy FF suffered from various undisclosed problems. Specifically, Legacy FF had assets in China frozen by courts, a significant percentage of customer deposits were attributable to a single undisclosed affiliate, and Legacy FF's cars were not as close to production as was claimed.

130.   In light of these issues, the PSAC Defendants breached their fiduciary duties to the Company by causing PSAC to merge with Legacy FF on terms that were unfavorable to the Company and its pre-Merger shareholders.

131.   Specifically, the PSAC Defendants agreed to a merger under which Legacy FF's pre-Merger stakeholders would own approximately 212.9 million shares or approximately 66% of the voting control of the post-Merger Company. Pre-Merger PSAC stockholders would receive 30.2 million shares or approximately 9.4% of the voting control of the post-Merger Company. The remaining 24.6% of voting control and shares was to be held by investors purchasing PSAC common stock in a private placement. Furthermore, according to the Proxy Statement, after such time as the post-Merger Company at the end

of any 20 consecutive trading days, has a volume weighted average total equity market capitalization of at least $20 billion, holders of shares of Company Class B common stock will be entitled to ten votes for each such share, which will cause Legacy FF stakeholders to own 87.7% of the voting control of the Company, PSAC stockholders will own approximately 3.4% of the voting control of the post-Merger Company and approximately 8.9% of the voting control of the Company will be held by the investors purchasing PSAC common stock in a private placement.

132. Thus, despite the issues plaguing Legacy FF, PSAC's acquisition of Legacy FF resulted in pre-Merger PSAC stockholders owning only a small fraction of the Company's shares and less than 10% of the voting control of the post-Merger Company, upon the consummation of the Merger. Moreover, the triggering condition described in the foregoing paragraph further illustrates that the Merger was structured to favor Legacy FF stakeholders, if the triggering condition were satisfied, would own 87.7% of the voting control of the Company.

133. The PSAC Defendants were in a position to know the state of Legacy FF prior to the Merger in the course of conducting due diligence, and despite knowing of the poor state of affairs of Legacy FF, they agreed to the Merger on terms that were unreasonable given the true, yet undisclosed, state of affairs.

134. Indeed, the PSAC Defendants knowingly and admittedly did not obtain a third-party valuation or fairness opinion in connection with their determination to approve the Merger with Legacy FF. In an attempt to justify their decision to forego a third-party valuation or fairness opinion, in the Proxy Statement, the PSAC Defendants boasted that their "substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and concluded that their experience and backgrounds, together with the experience and sector expertise of PSAC's financial advisors, enabled them to make the necessary analyses and determinations" concerning the Merger with Legacy FF.

135.    However, the PSAC Defendants' interests with respect to the Merger diverged from those of PSAC shareholders, including because all five of the PSAC Defendants are members or managing members of Sponsor, which held certain Private Shares that would become worthless in the event PSAC failed to consummate a transaction by April 24, 2022.

136.    Thus, the PSAC Defendants placed their own self-interest over the interest of the Company and the pre-Merger Company's shareholders, and agreed to the Merger on less favorable terms than were reasonable, given the poor state of Legacy FF, which would only later become publicly-known.

137.    In breach of their fiduciary duties to the Company, the PSAC Defendants engaged in the Overpayment Misconduct by causing PSAC to acquire Legacy FF on unfavorable terms to PSAC shareholders despite that Legacy FF, *inter alia*: (1) had certain assets in China frozen by courts, (2) was not as close to delivering vehicles as was stated, (3) had exaggerated the number of deposits received for future deliveries, a material number of which were attributable to an undisclosed affiliate.

**False and Misleading Statements Issued Prior to the Merger**

***January 28, 2021 Press Release***

138.    On January 28, 2021, PSAC and Legacy FF issued a press release titled "Faraday Future to List on NASDAQ Through Merger With Property Solutions Acquisition Corp. With Estimated $1 Billion in Proceeds." In the press release, PSAC and Legacy FF announced the Merger Agreement, noting that the merged Company would be listed on NASDAQ. The press release further provided as follows:

> This transaction validates FF's vision to create a mobility ecosystem built upon innovations in technology and products. FF's flagship product offering will be the FF 91, featuring industry leading 1,050 HP, 0-60 mph in less than 2.4 seconds, zero gravity seats with the largest 60-degree reclining angles and a revolutionary user experience designed to create a mobile, connected, and luxurious third Internet living space. FF 91 is targeted to launch within twelve months after closing of the merger.

> Commenting on today's significant milestones, Faraday Future's Global

Chief Executive Officer, Dr. Carsten Breitfeld said, "We are excited to enter into this partnership with PSAC. This is an important milestone in our company's transformation, one that we achieved with strong commitment from our employees, suppliers, and partners in the U.S. and China, as well as the city of Hanford, California. I am excited that this business combination will allow us to launch the class defining FF 91, building upon the founder's original vision to help our users and shareholders take part in shaping the future of mobility."

"Faraday Future is a unique and differentiated electric vehicle company with significant growth prospects for the future," said Property Solutions Co-CEO and Chairman Jordan Vogel. "We believe the excellent management team, led by Dr. Breitfeld, and industry-leading technology will allow Faraday Future to reach its true growth potential."

FF has invested over $2 billion dollars since its inception. In addition to the development of its first model FF 91, the product definition of the second model FF 81 has been completed, and the R&D work is progressing.

139.   The January 28, 2021 press release touted delivery timelines for anticipated vehicles and touted "14,000 reservations" for Legacy FF's flagship model, the FF 91:

FF's B2C passenger vehicle launch pipeline over the next five years includes FF 91 series, FF 81 series, and FF 71 series. FF 91 will define the FF brand DNA. This DNA will carry over to subsequent premium mass market vehicles in the portfolio - the FF 81, and FF 71. With such brand DNA, FF products are expected to be ahead of the competition in their respective segments in terms of their design, driving experience, interior comfort, connectivity, and user experience. FF 81 is expected to launch in 2023, and FF 71 in 2024. In addition to passenger vehicles, FF plans to launch a Smart Last Mile Delivery ('SLMD') vehicle in 2023 leveraging its proprietary VPA. To implement a capital light business model, FF has adopted a global hybrid manufacturing strategy consisting of its refurbished manufacturing facility in Hanford, California and collaboration with a leading contract manufacturing partner in South Korea. The company is exploring the possibility of additional manufacturing capacity in China through a joint venture.

***As the world's only tech-luxury intelligent Internet electric vehicle brand, FF expects to sell more than 400,000 units cumulatively over the next five years, and its first flagship model, the FF 91, has received over 14,000 reservations.***

(Emphasis added.)

***March 19, 2021 Form 425***

140.     On March 19, 2021, PSAC filed a Form 425 with the SEC that contained a transcript from a question-and-answer ("Q&A") session with IPO Edge, a news company focused on mergers and public offerings. In the Q&A, the Company stated:

> ***FF has the most exciting growth opportunity ahead in the EV market. The transaction is expected to fully fund the production of our flagship halo vehicle, the luxury electric FF 91, within 12 months of close.*** The FF 91 is scheduled to launch in 2022, making our market disrupting product a relatively near-term reality. Our technology has been tested by the world's leading experts, who believe we have an edge that can transform the market with unparalleled performance. FF is led by a world-class management team with deep automotive, software, and internet experience.

> ***We have existing demand for the FF 91 by way of more than 14,000 reservations, and a strong strategy to scale in the US and China.*** The strong signal we are seeing from China significantly expands the opportunity ahead for FF, evidenced by the fact that we have a Tier 1 city and a top three Chinese OEM participating in the PIPE financing. These strategic partners will help establish FF's presence in the Chinese market, further solidifying FF's unique US-China dual home market strategy.

(Emphasis added.)

***April 5, 2021 Registration Statement***

141.     On April 5, 2021, PSAC filed a registration statement on Form S-4 with the SEC (the "Registration Statement"). The Registration Statement stated the following regarding Legacy FF's milestones toward commercializing its vehicles:

> FF intends to commercially launch FF 91 series within twelve months after closing of the Business Combination. Toward that goal, FF has completed most of the vehicle development milestones, including 29 prototype and 13 pre-production assets. FF 91 series is designed to compete with Maybach, Bentley Bentayga, Lamborghini Urus, Ferrari Purosangue, Mercedes S-Class, Porsche Taycan, BMW 7-Series etc.

142.   In listing and touting Legacy FF's purported "Competitive Strengths," the

Registration Statement included: "Speed to market with the ability to launch commercial production within 12 months after the Business Combination." Immediately below this statement touting Legacy FF's production timeline, the Registration Statement stated as follows:

> FF has achieved major commercial milestones to bring its FF 91 model to the market. Unlike many competitors, FF has the advantage of speed to market as it is positioned to launch a production try-out in 9 months and commercial production of FF 91 series within 12 months after the Business Combination. FF has completed 29 prototypes and 13 pre-production assets and has completed most of the vehicle development hurdles including feasibility, concept and development phases. As of the date hereof, 94% of the key components for FF 91 have been sourced, 91% production tooling is complete and 75% of production equipment is complete.

### June 24, 2021 Proxy Statement

143.    On June 24, 2021, the Company filed the Proxy Statement with the SEC, which served as a proxy statement, consent solicitation statement, and prospectus. The PSAC Defendants solicited the Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions. The Proxy Statement also contained a Notice of Solicitation of Written Consents or Proxies from the Board of Directors of Legacy FF to Legacy FF Shareholders.

144.  The Proxy Statement announced a forthcoming special meeting of stockholders on July 20, 2021 and asked PSAC stockholders to: (1) approve the Merger; (2) approve amendments to PSAC's amended and restated certificate of incorporation; (3) elect nine directors to the Board; (4) to approve, for purposes of complying with NASDAQ listing rules, the issuance of PSAC common stock to certain accredited investors and qualified institutional buyers in private placements (the "NASDAQ Proposal"); and (5) to approve the Faraday Future Intelligent Electric Inc. 2021 Stock Incentive Plan (the "2021 Plan").

145.  Like the Registration Statement, the Proxy Statement listed Legacy FF's "Competitive Strengths" as including: "Speed to market with the ability to launch

commercial production within 12 months after the Business Combination." Immediately below this statement touting Legacy FF's production timeline, the Proxy Statement stated as follows:

> FF has achieved major commercial milestones to bring its FF 91 model to the market. Unlike many competitors, ***FF has the advantage of speed to market as it is positioned to launch a production try-out in 9 months and commercial production of FF 91 series within 12 months after the Business Combination.***

(Emphasis added.)

146.    The Proxy Statement stated the following regarding the Board's risk oversight functions:

> New FF's board of directors will oversee the risk management activities designed and implemented by management. New FF's board of directors will execute its oversight responsibility both directly and through its committees. New FF's board of directors will also consider specific risk topics, including risks associated with its strategic initiatives, business plans and capital structure. New FF's management, including its executive officers, is primarily responsible for managing the risks associated with the operation and business of the company and will provide appropriate updates to the board of directors and the audit committee. New FF's board of directors will delegate to the audit committee oversight of its risk management process, and its other committees will also consider risk as they perform their respective committee responsibilities. All committees will report to the board of directors as appropriate, including when a matter rises to the level of material or enterprise risk.

147.    The Proxy Statement also listed certain responsibilities of the post-Merger Company's Audit Committee, which upon the consummation of the Merger consisted of Defendants Swenson, Goh, and S. Vogel, with Swenson serving as Chair. The Proxy Statement provided as follows:

> The purpose of the audit committee will be, among other things, to appoint, retain, set compensation of, and supervise New FF's independent registered public accounting firm, review the results and scope of the audit and other accounting related services and review New FF's accounting practices and systems of internal accounting and disclosure controls.

148.   The statements referenced in ¶¶ 146–47 were false and misleading because, given the issues with Legacy FF, which had not been disclosed by either the PSAC Defendants or by the Legacy FF Defendants but about which they knew or should have known, it was unreasonable to state that the post-Merger Company's Board and Audit Committee would exercise risk oversight and review accounting practices as well as review accounting and disclosure controls.

149.   The Proxy Statement also had the following to say regarding the administration of the 2021 Plan:

> The 2021 Plan will be administered by the compensation committee of the New FF board of directors, or a subcommittee thereof, or such other committee designated by the New FF board of directors (the "Plan Committee"), in each case consisting of two or more members of the New FF board of directors. Each member of the Plan Committee is intended to be (i) a "non-employee director" within the meaning of Rule 16b-3 under the Exchange Act, and (ii) "independent" within the meaning of the rules of Nasdaq.

> Subject to the express provisions of the 2021 Plan, the Plan Committee has the authority to select eligible persons to receive awards and determine all of the terms and conditions of each award. All awards are evidenced by an agreement containing such provisions not inconsistent with the 2021 Plan as the Plan Committee approves. The Plan Committee also has authority to establish rules and regulations for administering the 2021 Plan and to decide questions of interpretation or application of any provision of the 2021 Plan. The Plan Committee may take any action such that (i) any outstanding options and SARs become exercisable in part or in full, (ii) all or any portion of a restriction period on any outstanding awards lapse, (iii) all or a portion of any performance period applicable to any awards lapse, and (iv) any performance measures applicable to any outstanding awards be deemed satisfied at the target, maximum or any other level.

> The Plan Committee may delegate some or all of its power and authority under the 2021 Plan to the New FF board of directors, a subcommittee of the New FF board of directors, a member of the New FF board of directors, the Chief Executive Officer or other executive officer of New FF as the Plan Committee deems appropriate, except that it may not delegate its power and authority to a member of the New FF board of directors, the Chief Executive Officer or

any executive officer with regard to awards to persons subject to Section 16 of the Exchange Act.

150.    Regarding eligibility for the 2021 Plan, the Proxy Statement provided as follows:

> ***Participants in the 2021 Plan will consist of such officers, other employees, non-employee directors, consultants, independent contractors and agents of New FF and its subsidiaries (and such persons who are expected to become any of the foregoing) as selected by the Plan Committee.*** The aggregate value of cash compensation and the grant date fair value of shares of common stock that may be awarded or granted during any fiscal year of New FF to any non-employee director will not exceed $750,000. As of March 18, 2021, approximately 345 employees and 1 non-employee director are eligible to participate in the 2021 Plan if selected by the Plan Committee to participate.

(Emphasis added.)

151.    The Proxy Statement was materially misleading because it failed to disclose that: (1) the PSAC Defendants had failed to exercise risk oversight functions at PSAC and were causing or permitting PSAC to issue false and misleading statements, and thus the PSAC Defendants were breaching their fiduciary duties; (2) the post-Merger Company's Board and Audit Committee would not adequately exercise these functions and cause or permit the Company to issue false and misleading statements, as discussed *supra* ¶148; and (3) Defendant J. Vogel, who was on the PSAC Board and who was breaching his fiduciary duties, was improperly interested in increasing his unjust compensation and the future compensation of his brother S. Vogel by seeking shareholder approval of the 2021 Plan.

152.    The Proxy Statement also failed to disclose that: (1) Legacy FF was not as close to producing vehicles as it claimed; (2) courts had frozen some of Legacy FF's assets in China; (3) despite claiming to have received 14,000 reservations for the FF 91, only several hundred of Legacy FF's reservations were paid, while the others were unpaid indications of interest; (4) a material portion of Legacy FF's deposits for future vehicle deliveries were attributable to a single, undisclosed affiliate; (5) as a result of the foregoing, the post-Merger Company would be unable to file its quarterly report for the fiscal period ended September 30, 2021; and (6) the Company failed to maintain internal controls.

153.   As a result of the material misstatements and omissions contained in the Proxy Statement, Company shareholders elected Defendants Aydt, Breitfeld, Krolicki, J. Vogel, and Ye to the Board, who had breached their fiduciary duties to the Company or aided and abetted such breaches, allowing them to breach their fiduciary duties to post-Merger Faraday, and elected Defendants Goh, Liu, Swenson, and S. Vogel to the Board, who breached their fiduciary duties to the Company. Furthermore, as a result of the material misstatements and omissions in the Proxy Statement, Company shareholders approved the Merger, approved amendments to PSAC's amended and restated certificate of incorporation, approved the 2021 Plan, and approved the NASDAQ Proposal.

**False and Misleading Statements Issued Following the Merger**

*September 19, 2021 Investor Presentation*

154.   On September 19, 2021, the Company gave a business update at a "919 Futurist Day" event hosted by the Company. The business update included written presentation materials, which the Company attached to a Form 8-K filed with the SEC on September 20, 2021. In the presentation materials, the Company stated:

> The transaction is expected to fully fund the production of class-defining performance luxury electric FF 91 within 12 months of transaction close. This transaction also supports the future development of the Company's unique I.A.I (Internet, Autonomous Driving, Intelligence) system.

155.   The presentation materials further stated that "Faraday Future's advanced manufacturing and factory operations teams have made significant progress with the support of our equipment suppliers in preparing the Hanford factory for the launch of the FF91."

156.   The statements referenced in ¶¶ 138–42 and 154–55 were materially false and misleading because the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company was not as close to producing vehicles as it claimed; (2) courts had frozen some of the Company's assets in China; (3) despite claiming to have received 14,000 reservations for the FF 91, only several hundred of the Company's reservations were paid,

while the others were unpaid indications of interest; (4) a material portion of the Company's deposits for future vehicle deliveries were attributable to a single, undisclosed affiliate; (5) as a result of the foregoing, the Company was unable to file its quarterly report for the fiscal period ended September 30, 2021; and (6) the Company failed to maintain internal controls

## **Truth Begins to Emerge as False and Misleading Statements Continue**

### *October 7, 2021 Report*

157. The truth began to emerge on October 7, 2021, when J Capital published the Report. The Report maintained that the Company was not as close to producing vehicles as it claimed, that courts had frozen some of the Company's assets in China, and that a material portion of the Company's deposits for future vehicle deliveries were attributable to a single, undisclosed affiliate.

158. The Report began as follows, noting past reneging on promised construction of factories, unpaid suppliers, and issues with purported reservations for forthcoming vehicles:

> We don't think Faraday Future (FFIE), an EV SPAC, will ever sell a car. So far, it's nothing but a bucket to collect money from U.S. investors and pour it into the black hole of debt created by its founder, China's best-known securities fraudster, Jia Yueting.

> After eight years in business, FFIE has failed to deliver a car and is yet again saying "next year." The company has reneged on promises to build factories in five localities in the U.S. and China and repeatedly delayed the sixth. FFIE is being sued by dozens of unpaid suppliers and has failed to disclose that assets in China have been frozen by courts. And Jia appears to be running the company behind the scenes.

> Given the current bubble environment, FFIE nevertheless managed to raise about $1 bln from U.S. investors via PIPEs and SPAC merger in July. Now it promises to restart its abandoned factory in Hanford, California and mass-produce cars in just seven months. We doubt that timeline will hold: three recent visits to the factory showed little activity, and company formers told us there are still engineering problems to work out.

FFIE is the malformed lovechild of the imperiled Chinese real estate developer Evergrande (3333 HK) and Jia, China's fugitive default king. We expect Evergrande, which owns 20.5% of this company and stands to gain more equity, to sell off its shares as soon as the lockup period ends, in January 2022 if not, quietly, before that.

*In January 2021, the company claimed it had 14,000 reservations for the car—until one week after Hindenburg published its findings that Lordstown's orders were faked. Without explanation, after March 19, FFIE no longer made reference to the number of reservations.2 In fact, these reservations--78% of which were from a single company—had been converted in 2020 to a note payable earning 8% interest. The company strongly implies that the mystery booker, who was apparently ready to spend well over $1 bln on FFIE cars, may be an "affiliate." They fail to say who it was. In H1 2021, despite the upcoming SPAC merger, FFIE took in just $144,000 in new customer deposits.*

(Emphasis added.)

159. The Report continued by alleging that the Company was not ready to begin production of the car:

On September 20, 2021, the company issued a new presentation claiming progress toward manufacturing. But former engineering executives we interviewed did not believe that the car was ready for production. FFIE's contention that it needed just $90 mln to start mass production in seven months is "not even in the ballpark of true," said one formerly highly placed executive. Another former executive said, "The story with the SPAC is that they just needed money to manufacture, but I think there are still some critical engineering issues."

Chinese government reports show that in 2016, FFIE's subsidiary LeSee put $154 mln into the company's largest planned manufacturing site, in China's Zhejiang Province, but we visited the location and found nothing but an overgrown field. The area is so deserted that even the police station in what was intended to be the Faraday factory park has closed.

160. The Report also revealed issues that led to the freezing of certain of Legacy FF's assets in China:

*Jia Yueting, FFIE founder, has been banned for life from being associated with publicly listed companies in China. FFIE admits in its "risks" section*

*that he has "illegally" provided funding and guarantees to affiliated companies, improperly diverted proceeds from the public offering of a company he controlled, and lied to Chinese regulators and investors.* In Hong Kong, where he was chairman of the long-halted Coolpad Group Limited (2369 HK), he failed to disclose key transactions.

*Holding the title "Partner, Chief Product & User Ecosystem Officer," Jia still controls key spending decisions at FFIE through the FF Global Executive Committee. Because of him, FFIE's USD accounts in China have been frozen by regulators.* In a lawsuit against FFIE, the company's former General Counsel Hong Liu claimed that a Jia "clique" controlled the company regardless of legal commitments.

Embarrassed by Jia, FFIE hired a "professional" CEO in September 2019, but his track record in Chinese EVs is not much better. Carsten Breitfeld was co-founder of Nanjing-based Byton, which owed suppliers and employees millions of dollars when it stopped operating in 2020. He conveniently omits from his bio in the prospectus his ill-fated tenure as CEO of another Chinese EV hopeful called Iconiq, which raised over ¥1.2 bln before going silent. He gets tepid reviews from formers.

In the current overheated EV environment, the company appears to be having difficulty finding talent. In September, FFIE announced new executives: one from Lordstown—the company an FFIE former said "is setting new standards for fraud"--and two from Karma, a moribund company that the auto news site Jalopnik claims may have faked prototypes. One of the Karma graduates is an ex-vice president of A123 Systems, a formerly U.S.-listed Chinese company that has been sued multiple times for patent infringement and securities fraud.

(Emphasis added.)

161.    On this news, the price per share of the Company's common stock fell $0.35, or approximately 4.2%, from its closing price on October 6, 2021, to close at $8.05 per share on October 8, 2021.

### November 2, 2021 Press Release and Form 8-K

162.    On November 2, 2021, the Company announced that Defendant Glasman had resigned as CFO of the Company effective October 27, 2021, and that Defendant McBride was appointed to succeed Defendant Glasman, effective November 1, 2021. The press

release stated, "Mr. McBride succeeds Zvi Glasman, who resigned as CFO of the company to pursue other opportunities." The press release was attached as an exhibit to a current report filed by the Company on Form 8-K the same day, which stated, "Mr. Glasman's departure from the Company is not a result of any disagreement with the Company's independent auditors or any member of management on any matter of accounting principles or practices, financial statement disclosure, or internal controls."

163.    The statements referenced in the foregoing paragraph were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) as a result of the materially false and misleading statements discussed herein, the Company could not timely file its quarterly report for the fiscal period ended September 30, 2021; and (2) the Company failed to maintain adequate internal controls. As a result, Faraday's public statements were materially false and misleading at all relevant times.

## **The Truth Emerges**

### *November 15, 2021 Press Release*

164.    On November 15, 2021, the Company issued a press release titled "Faraday Future Provides Business Update." The Company disclosed that it could not timely file its quarterly report on Form 10-Q for the fiscal period ended September 30, 2021. The press release also stated that the Company's Board had "formed a special committee of independent directors to review allegations of inaccurate disclosures," and alluded to the J Capital Report. The press release stated as follows, in relevant part:

> Faraday Future Intelligent Electric Inc. ("Faraday Future" or the "Company") (NASDAQ: FFIE), a California-based global shared intelligent electric mobility ecosystem company, filed a Form 12b-25 notifying the SEC that it is unable to file its Form 10-Q for the fiscal quarter ended September 30, 2021 within the prescribed time period, and does not expect to file it by the extended filing date pursuant to Rule 12b-25. The Company is also unable to file its amended Registration Statement on Form S-1 (File No. 333-258993) (the "Form S-1/A") at this time.

The Company's Board of Directors formed a special committee of independent directors to review allegations of inaccurate disclosures, including claims made in a report issued by an investor with a history of seeking to drive down public companies' stock prices for its own benefit. Faraday Future seeks to do business in the most ethical and transparent way. As a new public company, the Board, as part of its review, is seeking to ensure that the Company is adhering to the highest standards of conduct.

The special committee's review is ongoing, and it is working diligently with independent counsel and advisors to complete its review as soon as possible. The Company is committed to working with the special committee to complete its work in order to re-establish timely financial reporting as soon as feasible. Until the review is complete, the Company is not able to file its Form 10-Q or Form S-1/A.

165. On this news, the price of the Company's common stock fell $0.28, or approximately 3.2%, from its closing price of $9.11 on November 15, 2021, to close at $8.83 per share on November 16, 2021.

### Results of Special Committee Investigation

166. On February 1, 2022, the Company issued a press release announcing the conclusion of the Special Committee's investigation. In connection with its review, the Special Committee made four findings.

167. First, in connection with the Merger, "the Special Committee found that statements made by certain Company employees to certain investors describing Mr. Jia's role within the Company were inaccurate," and Defendant Jia's involvement in the management of the Company post-Merger "was more significant than what had been represented to certain investors."

168. Second, the Special Committee found that the Company's statements leading up to the Merger "that it had received more than 14,000 reservations for the FF 91 vehicle were ***potentially misleading*** because only several hundred of those reservations were paid, while the others (totaling 14,000) were unpaid indications of interest." (Emphasis added.)

169. Third, the Special Committee found that, "[c]onsistent with the Company's

previous public disclosures regarding identified material weaknesses in its internal controls, **the Company's internal controls over financial accounting and reporting require an upgrade in personnel and systems.**" (Emphasis added.)

170. Fourth, the Special Committee found that "[t]he Company's corporate culture failed to sufficiently prioritize compliance."

171. As a result of the Special Committee's investigation and findings, the Board implemented remedial actions. These remedial actions included the following, among other actions:

- Defendant Swenson was appointed to the newly created position of Executive Chairperson of the Company;
- Defendants Breitfeld and Jia will report directly to Defendant Swenson and each will receive a 25% annual base salary reduction;
- Defendant J. Vogel was appointed Lead Independent Director;
- Defendant Krolicki stepped down from his role as Chairman of the Board;
- Defendant S. Vogel became Chair of the Audit Committee and the Nominating and Corporate Governance Committee;
- Jarret Johnson, Vice President, General Counsel and Secretary, will be separating from the Company; and
- Defendant Wang was suspended without pay until further notice.

## **DAMAGES TO FARADAY**

172. As a direct and proximate result of the Individual Defendants' misconduct, Faraday has lost and will continue to lose and expend many millions of dollars.

173. Such expenditures include, but are not limited to, fees associated with the Securities Class Action filed against the Company and Defendants Breitfeld, Feldman, Glasman, Jia, McBride, and J. Vogel, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

174.   Such expenditures further include the amount PSAC overpaid for Legacy FF due to the problems with Legacy FF described herein.

175.   Such expenditures include payments to the Individual Defendants under the 2021 Plan, which was approved at least in part due to the false and misleading statements issued or caused to be issued by the Individual Defendants.

176.   Such expenditures include expenses associated with the Company's failure to maintain internal controls and the failure to timely file reports with the SEC.

177.   Additionally, these expenditures include, but are not limited to, lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

178.   As a direct and proximate result of the Individual Defendants' conduct, Faraday has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

179.   Plaintiff brings this action derivatively and for the benefit of Faraday to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Faraday, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

180.   Faraday is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

181.   Plaintiff is, and has been at all relevant times, a shareholder of Faraday. Plaintiff will adequately and fairly represent the interests of Faraday in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in

derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

182.  Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

183.  A pre-suit demand on the Board of Faraday is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Breitfeld, Aydt, Goh, Krolicki, Liu, Swenson, J. Vogel, S. Vogel, and Ye (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

184.  Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, to fail to timely file reports with the SEC, and to cause the Company to engage in the Overpayment Misconduct, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

185.  In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the foregoing schemes to cause the Company to make false and misleading statements, to fail to timely file reports with the SEC, and to engage in the Overpayment Misconduct. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Directors caused the Company to fail to maintain internal controls. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

186.  Additional reasons that demand on Defendant Breitfeld is futile follow. Defendant Brieitfeld served as CEO and a director of FF prior to the Merger and held those roles at the post-Merger Company as well. In addition, he is a member of the Finance and

Investment Committee. Thus, as the Company admits, he is a non-independent director. As CEO of the Company following the Merger, Defendant Breitfeld was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period following the consummation of the Merger. Moreover, he was CEO of Legacy FF, and was ultimately responsible for the false and misleading statements and omissions that were made by Legacy FF during the portion of the Relevant Period prior to the Merger, when the Legacy FF Defendants were aiding and abetting the PSAC Defendants' breaches of fiduciary duty. These include the false and misleading statements in the Proxy Statement, which was solicited by the Boards of both PSAC and Legacy FF. The false and misleading statements in the Proxy Statement contributed to Defendant Breitfeld's election to the Board. As CEO, the Company provides Defendant Breitfeld with his principal occupation for which he receives handsome compensation, including a base salary that reached at least $2.25 million prior to the outcome of the Special Committee's investigation. Thus, he cannot disinterestedly consider a demand to sue the directors that control his continued employment, other members of management with whom he worked or still works, and himself. Moreover, Defendant Breitfeld is named as a defendant in the Securities Class Action. As Faraday's highest officer, and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. Moreover, as Legacy FF's highest officer, he aided and abetted the PSAC Defendants' breaches of fiduciary duty prior to the Merger, including PSAC's engagement in the Overpayment Misconduct. In addition, during the Relevant Period he failed to correct the false and misleading statements. For these reasons, Defendant Breitfeld breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

187.    Additional reasons that demand on Defendant Aydt is futile follow. Defendant Aydt served as Legacy FF's Senior Vice President of Business Development and Product Definition from November 2019 until the Merger, and has continued to serve in that role following the Merger. He served as a director of Legacy FF prior to the Merger, and he joined the Company's Board upon the consummation of the Merger. Thus, as the Company admits, he is a non-independent director. As a Director of the Company following the Merger and as an officer and director of Legacy FF, Defendant Aydt bears significant culpability for the issuance of false and misleading statements during the Relevant Period. These include the false and misleading statements in the Proxy Statement, which was solicited by the Boards of both PSAC and Legacy FF. The false and misleading statements in the Proxy Statement contributed to Defendant Aydt's election to the Board. The Company provides Defendant Aydt with his principal occupation for which he receives handsome compensation, including a base salary of $400,000. Thus, he cannot disinterestedly consider a demand to sue the directors that control his continued employment, other members of management with whom he worked or still works, and himself. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. Moreover, he aided and abetted the PSAC Defendants' breaches of fiduciary duty prior to the Merger, including PSAC's engagement in the Overpayment Misconduct. In addition, during the Relevant Period he failed to correct the false and misleading statements. For these reasons, Defendant Aydt breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

188.    Additional reasons that demand on Defendant Goh is futile follow. Defendant Goh has served as a Company director since the Merger. He serves as Chair of the Finance

and Investments Committee and as a member of the Audit Committee. He receives significant compensation from the Company for his service on the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period he failed to correct the false and misleading statements. For these reasons, Defendant Goh breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

189.  Additional reasons that demand on Defendant Krolicki is futile follow. Defendant Krolicki served on Legacy FF's Board prior to the Merger and was appointed to the Board of the Company upon the consummation of the Merger. He serves as Chairman of the Board and as Chair of the Nominating and Corporate Governance Committee. Defendant Krolicki is entitled to significant compensation for his role at the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. Moreover, he aided and abetted the PSAC Defendants' breaches of fiduciary duty prior to the Merger, including PSAC's engagement in the Overpayment Misconduct. In addition, during the Relevant Period he failed to correct the false and misleading statements. For these reasons, Defendant Krolicki breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

190.  Additional reasons that demand on Defendant Liu is futile follow. Defendant Liu has served as a member of the Board since the Merger. He serves as Chair of the

Compensation Committee and as a member of the Nominating and Corporate Governance Committee. He receives significant compensation from the Company for his service on the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period he failed to correct the false and misleading statements. For these reasons, Defendant Liu breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

191. Additional reasons that demand on Defendant Swenson is futile follow. Defendant Swenson served as a member of the Board, as Chair of the Audit Committee, and as a member of the Compensation Committee following the Merger, and is currently Executive Chairperson of the Company. She receives significant compensation from the Company for her service as Executive Chairperson. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period she failed to correct the false and misleading statements. For these reasons, Defendant Swenson breached her fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

192. Additional reasons that demand on Defendant J. Vogel is futile follow. Defendant J. Vogel served as PSAC's Chairman and Co-CEO from its inception until the Merger, when he joined the Company's Board. He is a member of the Compensation Committee, and has recently been appointed to the position of Lead Independent Director.

In addition, he is a managing member of Sponsor. Defendant J. Vogel is the brother of Defendant S. Vogel. As Co-CEO of PSAC prior to the Merger, Defendant J. Vogel shared ultimate responsibility for all of the false and misleading statements and omissions that were made during the Relevant Period prior to the Merger. Moreover, he became a director of the Company following the Merger, and the false and misleading statements by the Company following the Merger were issued under the Board's authority. The Proxy Statement was solicited on Defendant J. Vogel's behalf, and the false and misleading statements therein contributed to his reelection to the Board. Moreover, the false and misleading statements in the Proxy Statement led PSAC shareholders to approve the 2021 Plan, under which "officers, other employees, non-employee directors, consultants, independent contractors and agents" of the Company and its subsidiaries, as selected by the Board or a subcommittee thereof, were eligible for awards of long-term equity incentives. Thus, because of the possibility that either he or his brother Defendant S. Vogel could receive awards of equity incentives under the 2021 Plan, Defendant J. Vogel is not reasonably likely to investigate the false and misleading statements in the 2021 Proxy Statement. Defendant J. Vogel receives significant compensation from the Company for his service on the Board. As PSAC's Co-CEO and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements and to engage in the Overpayment Misconduct, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period he failed to correct the false and misleading statements, and he engaged in the Overpayment Misconduct. Moreover, his engagement in the wrongdoing violated the PSAC Code. For these reasons, Defendant J. Vogel breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

193.   Additional reasons that demand on Defendant S. Vogel is futile follow.

Defendant S. Vogel has served as a member of the Board since the Merger and is the brother of Defendant J. Vogel. He receives significant compensation from the Company for his service on the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period he failed to correct the false and misleading statements. For these reasons, Defendant S. Vogel breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

194.   Additional reasons that demand on Defendant Ye is futile follow. Defendant Ye joined Legacy FF in February 2018 and served as its Vice President of Business Development until the Merger. Following the Merger, Defendant Ye became a member of the Board and continued serving as Vice President of Business Development. Defendant Ye is entitled to significant compensation for his role at the Company, including a base salary of $300,000. Thus, as the Company admits, he is a non-independent director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. Moreover, he aided and abetted the PSAC Defendants' breaches of fiduciary duty prior to the Merger, causing PSAC's engagement in the Overpayment Misconduct. In addition, during the Relevant Period he failed to correct the false and misleading statements. For these reasons, Defendant Ye breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

195.   Additional reasons that demand on the Board is futile follow.

196.   The Company announced on November 15, 2021 that it was creating the Special Committee to investigate allegations of inaccurate disclosures. When the results of the Special Committee's investigation were announced on February 1, 2022, the most severe remedial steps taken by the Company were the suspension without pay of Defendant Wang, and the separation of Jarret Johnson, Vice President, General Counsel and Secretary, from the Company. The remedial actions approved by the Board on January 31, 2022 did not include litigation against any of the alleged wrongdoers to recover for the harm suffered by the Company. Accordingly, because the Board was presented with the Special Committee's findings but failed to initiate litigation to recover on the Company's behalf, the Board cannot reasonably be expected to bring suit to redress the misconduct described herein. Demand against the Board is therefore futile and excused.

197.   The members of the Board, as officers or non-employee directors of the Company, are eligible to participate in the 2021 Plan, under which they may receive long-term equity incentives. The 2021 Plan was improperly approved due to the false and misleading statements in the Proxy Statement, which was solicited by the PSAC Defendants. Because the Directors are eligible to receive increased compensation under the 2021 Plan, they cannot independently and disinterestedly investigate the misconduct of the PSAC Defendants in issuing the false and misleading statements that led to the approval of the 2021 Plan. Accordingly, demand upon the Directors would be futile.

198.   The Directors have longstanding business, personal, and familial relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants J. Vogel and S. Vogel are brothers, making it exceedingly unlikely that either would initiate an investigation into the misconduct of the other. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

199.    Certain of the Directors are also connected through or beholden to FF Global, which exerts influence over the Company's management through FF Global's issuance of equity interests as additional compensation to Company management. As described in the Proxy Statement, FF Global is managed by an eight-member executive committee that, as of the time of the Proxy Statement, included Defendants Jia, Aydt, Wang, Deng, and Breitfeld. FF Global is the managing member of Pacific, which indirectly controls FF Top, which held 121,438,964 shares of Company common stock as of July 21, 2021, or approximately 37.4% of the Company. FF Global may issue valuable equity interests to members of Company management and Company employees. As employees of the Company and as members of FF Global's executive committee, Defendants Aydt, Breitfeld, Deng, Jia, and Wang are beholden to one another due to FF Global's ability to grant additional compensation to Company management. Moreover, as part of Company management, Defendant Ye is also beholden to the members of FF Global's executive committee. Thus, Directors Aydt, Breitfeld, and Ye are incapable of independently and disinterestedly investigating any misconduct committed by one another or by Defendants Deng, Jia, and Wang.

200.    Defendants Goh, Swenson, and S. Vogel (the "Audit Committee Defendants") served as members of the Audit Committee upon the consummation of the Merger, with Defendant Swenson serving as Chair. The Audit Committee Defendants are responsible for overseeing, among other things, the quality and integrity of the Company's financial statements, the Company's legal and regulatory compliance, the Company's system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls and failed to ensure compliance with laws and regulations as they are charged to do. The Audit Committee Defendants' failure to ensure that adequate internal controls were in place caused the Company to issue false and misleading financial statements to investors, and to fail to timely file a quarterly report with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are

not disinterested, and demand is excused as to them.

201.   In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

202.   Faraday has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Faraday any part of the damages Faraday suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

203.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

204.   The acts complained of herein constitute violations of fiduciary duties owed by Faraday's officers and directors, and these acts are incapable of ratification.

205.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Faraday. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Faraday, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

206.   If there is no directors' and officers' liability insurance, then the Directors will not cause Faraday to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

207.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against the PSAC Defendants for Violations of Section 14(a) of the Exchange Act**

208.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in

contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

210.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

211.   Under the direction and watch of the PSAC Defendants, the Proxy Statement failed to disclose, *inter alia*: (1) the PSAC Defendants had failed to exercise risk oversight functions at PSAC and were causing or permitting PSAC to issue false and misleading statements, and thus the PSAC Defendants were breaching their fiduciary duties; (2) the post-Merger Company's Board and Audit Committee would not adequately exercise these functions and cause or permit the Company to issue false and misleading statements, as discussed *supra* ¶148; and (3) Defendant J. Vogel, who was on the PSAC Board and who was breaching his fiduciary duties, was improperly interested in increasing his unjust compensation and the future compensation of his brother S. Vogel by seeking shareholder approval of the 2021 Plan.

212.   The Proxy Statement also failed to disclose that: (1) Legacy FF was not as close to producing vehicles as it claimed; (2) courts had frozen some of Legacy FF's assets in China; (3) despite claiming to have received 14,000 reservations for the FF 91, only several hundred of Legacy FF's reservations were paid, while the others were unpaid indications of interest; (4) a material portion of Legacy FF's deposits for future vehicle deliveries were attributable to a single, undisclosed affiliate; (5) as a result of the foregoing, the post-Merger Company would be unable to file its quarterly report for the fiscal period

ended September 30, 2021; and (6) the Company failed to maintain internal controls. As a result, the Proxy Statement was materially false and misleading.

213.   In the exercise of reasonable care, the PSAC Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statement, including but not limited to, the 2021 Plan, the NASDAQ Proposal, amendments to the Company's certificate of incorporation, and the election of the Directors.

214.   As a result of the material misstatements and omissions contained in the Proxy Statement, Company shareholders elected Defendants Aydt, Breitfeld, Krolicki, J. Vogel, and Ye to the Board, allowing them to continue breaching their fiduciary duties to Faraday, and elected Defendants Goh, Liu, Swenson, and S. Vogel to the Board, who breached their fiduciary duties to the Company. Furthermore, as a result of the material misstatements and omissions in the Proxy Statement, Company shareholders approved the Merger, amendments to PSAC's amended and restated certificate of incorporation, approved the 2021 Plan, and approved the NASDAQ Proposal.

215.   The Company was damaged as a result of the PSAC Defendants' material misrepresentations and omissions in the Proxy Statement.

216.   Plaintiff, on behalf of Faraday, has no adequate remedy at law

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties[2]

217.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

218.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Faraday's business and

---

[2] Plaintiff specifically excludes Defendant Deng from this claim.

affairs.

219.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

220.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Faraday.

221.   In breach of their fiduciary duties owed to Faraday, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Operating Faraday was not as close to producing vehicles as it claimed; (2) courts had frozen some of Operating Faraday's assets in China; (3) despite claiming to have received 14,000 reservations for the FF 91, only several hundred of Operating Faraday's reservations were paid, while the others were unpaid indications of interest; (4) a material portion of Operating Faraday's deposits for future vehicle deliveries were attributable to a single, undisclosed affiliate; (5) as a result of the foregoing, the Company was unable to file its quarterly report for the fiscal period ended September 30, 2021; and (6) the Company failed to maintain internal controls. As a result of the foregoing, Faraday's public statements were materially false and misleading at all relevant times.

222.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

223.   In further breach of their fiduciary duties, the PSAC Defendants caused the Company to engage in the Overpayment Misconduct.

224.   In further breach of their fiduciary duties, the PSAC Defendants also failed to timely file the Company's quarterly report for the fiscal quarter ended March 31, 2021.

225.    The Board and Defendant McBride breached their fiduciary duties by failing to timely file the Company's quarterly report for the fiscal quarter ended September 30, 2021.

226.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

227.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Faraday's securities.

228.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Faraday's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

229.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

230.    As a direct and proximate result of the Individual Defendants' breaches of

their fiduciary obligations, Faraday has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

231.   Plaintiff on behalf of Faraday has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment[3]

232.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

233.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Faraday.

234.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Faraday that was tied to the performance or artificially inflated valuation of Faraday, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company. This also includes compensation received under the 2021 Plan, which certain Individual Defendants induced the Company's shareholders to approve through false and misleading representations.

235.   Plaintiff, as a shareholder and a representative of Faraday, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, payments to the Individual Defendants under the 2021 Plan, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual

---

[3] Plaintiff specifically excludes Defendant Deng from this claim.

duties.

236.   Plaintiff on behalf of Faraday has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control[4]

237.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

238.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Faraday, for which they are legally responsible.

239.   As a direct and proximate result of the Individual Defendants' abuse of control, Faraday has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

240.   Plaintiff on behalf of Faraday has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement[5]

241.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

242.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Faraday in a manner consistent with the operations of a publicly-held corporation.

243.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Faraday has sustained and will continue to sustain significant damages.

244.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

---

[4] Plaintiff specifically excludes Defendant Deng from this claim.
[5] Plaintiff specifically excludes Defendant Deng from this claim.

Verified Shareholder Derivative Complaint

245.   Plaintiff on behalf of Faraday has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets[6]

246.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

247.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

248.   The PSAC Defendants caused the Company to engage in the Overpayment Misconduct, to the detriment of PSAC shareholders and the Company.

249.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Faraday to waste valuable corporate assets, including by, *inter alia*, by acquiring Legacy FF on terms unfavorable to PSAC shareholders, while Legacy FF suffered from undisclosed issues. The Individual Defendants' misconduct has caused the Company to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

250.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

251.   Plaintiff on behalf of Faraday has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Breitfeld, Feldman, Glasman, Jia, McBride, and J. Vogel for Contribution Under Section 10(b) and 21D of the Exchange Act

252.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

253.   Faraday and Defendants Breitfeld, Feldman, Glasman, McBride, J. Vogel, and

---

[6] Plaintiff specifically excludes Defendant Deng from this claim.

Jia are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Breitfeld's, Defendant Feldman's, Defendant Glasman's, Defendant Jia's, Defendant McBride's, and Defendant J. Vogel's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

254. Defendants Breitfeld, Feldman, Glasman, Jia, McBride, and J. Vogel, because of their positions of control and authority as officers and/or directors of the Company, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

255. Accordingly, Defendants Breitfeld, Feldman, Glasman, Jia, McBride, and J. Vogel are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

256. As such, Faraday is entitled to receive all appropriate contribution or indemnification from Defendants Breitfeld, Feldman, Glasman, Jia, McBride, and J. Vogel.

## EIGHTH CLAIM
### Against the Legacy FF Defendants for Aiding and Abetting
### Breach of Fiduciary Duty

257. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

258. The Legacy FF Defendants aided and abetted the PSAC Defendants who breached their fiduciary duties to the Company.

259.   The Legacy FF Defendants' misconduct resulted in continuous, connected, and ongoing harm to the Company.

260.   Specifically, the Legacy FF Defendants promoted the Merger by issuing false and misleading statements concerning Legacy FF's products, operations and business prospects. Moreover, the Legacy FF Defendants controlled and operated Legacy FF, the Company's operational predecessor, and caused Legacy FF to jointly issue press releases and SEC filings which contained materially false and misleading statements promoting the Company's future operations and prospects.

261.   The Legacy FF Defendants are jointly and severally liable to the same extent as the PSAC Defendants are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

262.   As a direct and proximate result of the Legacy FF Defendants' aiding and abetting of the PSAC Defendants' breaches of duty alleged herein, the Company has sustained and will continue to sustain substantial damages.

263.   Plaintiff on behalf of Faraday has no adequate remedy at law

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Faraday, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Faraday;

(c)   Determining and awarding to Faraday the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Faraday and the Individual Defendants to take all necessary actions to reform and improve Faraday's corporate governance and internal procedures to

comply with applicable laws and to protect Faraday and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

      2. a provision to permit the shareholders of Faraday to nominate at least five candidates for election to the Board;

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

    (e)    Awarding Faraday restitution from Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 8, 2022        Respectfully submitted,

                **THE BROWN LAW FIRM, P.C.**

                */s/ Robert C. Moest*
                Robert C. Moest, Of Counsel, SBN 62166
                2530 Wilshire Boulevard, Second Floor
                Santa Monica, California 90403
                Telephone: (310) 915-6628

Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Ashkan Farazmand, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of_____, 2022.

DocuSigned by:

*Ashkan Farazmand*

3/8/2022

303A3593B7C6424...