Robert C. Moest, Of Counsel (S.B.N. 62166)
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone:    (310) 915-6628
Facsimile:    (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| IN RE FARADAY FUTURE INTELLIGENT ELECTRIC INC. DERIVATIVE LITIGATION | Lead Case No. 2:22-cv-01570-CAS-(JCx) Consolidated with Case No. 2:22-cv-01852-CAS-(JCx) |
| This Document Relates to: ALL ACTIONS | Hon. Christina A. Snyder **DECLARATION OF TIMOTHY BROWN IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS** Date:         November 4, 2024 Time:         10:00 a.m. Place:        Courtroom 8D |

1    I, Timothy Brown, hereby declare under penalty of perjury:

2    1.    I am the managing partner at The Brown Law Firm, P.C., Lead Counsel for

3    Plaintiffs Ashkan Farazmand and Wangjun Zhou (the "California Plaintiffs") in the above-

4    captioned consolidated shareholder derivative action (the "California Action") and

5    counsel for Plaintiffs Ashkan Farazmand and Wangjun Zhou in *Farazmand v. Breitfeld,*

6    *et al.*, Case No. 2023-1283-LWW (Del. Ch.) (the "Delaware Chancery Action").[1] The

7    testimony provided herein is based on my own personal knowledge, information and belief

8    and, if called upon, I could and would competently testify thereto. I am admitted to

9    practice in New York State and am admitted *pro hac vice* before this Court.

10    2.    I submit this declaration in support of California Plaintiffs' unopposed

11    motion for final approval of settlement and California Plaintiffs' unopposed motion for

12    attorneys' fees, reimbursement of expenses, and service awards.  The purpose of this

13    declaration is to set forth the background and procedural history of the Derivative Actions,

14    the negotiations that led to the Settlement, and the results achieved.  This Declaration

15    further demonstrates that: (i) the Settlement is fair, reasonable, and adequate, and in the

16    best interest of Future Intelligent Electric Inc. f/k/a Property Solutions Acquisition Corp.

17    ("Faraday" or the "Company") and its shareholders; and (ii) the agreed-upon amount of

18    attorneys' fees and expenses to be paid to Plaintiffs' Counsel is fair and reasonable and

19    should be approved.

20    **I.    OVERVIEW**

21    3.    The Settlement resolves this California Action, in addition to: (i) the

22    Delaware Chancery Action; (ii) *Moubarak v. Breitfeld, et al.*, Case No. 1:22-cv-00467-

---

[1]    Unless otherwise noted, all capitalized terms herein shall have the same meaning as set forth in the Stipulation, which was submitted to the Court on July 19, 2024 (ECF No. 100) and the Memorandum of Law in Support of Plaintiffs' Unopposed Motion for Final Approval of Settlement ("Final Approval Memorandum") and the Memorandum of Law in Support of Plaintiffs' Unopposed Motion for Attorneys' Fees, Reimbursement of Expenses, and Service Awards ("Fee Memorandum"), both filed concurrently herewith.

1

DECLARATION OF TIMOTHY BROWN IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS

GBW (D. Del.); (iii) *Wang v. Breitfeld, et al.*, Case No. 1:22-cv-00525-GBW (D. Del.); and (iv) *Wallace v. Breitfeld, et al.*, Case No. 2023-0639-LWW (Del. Ch.).[2] The Settlement is the product of extensive arm's-length negotiations between Plaintiffs, the Individual Defendants, and Nominal Defendant Faraday (collectively, the "Parties"), overseen by Robert A. Meyer, Esq. of JAMS (the "Mediator"), a mediator experienced in complex stockholder litigation.

4.      Pursuant to the Settlement, Faraday agreed to adopt and/or enact important corporate governance reforms designed to address the alleged wrongdoing in the Actions and other general weaknesses in Faraday's corporate governance (the "Reforms"). As set forth in more detail below, and in the Final Approval Memorandum, the Reforms provide a substantial benefit to the Company and its shareholders. When weighed against the substantial risks of continued litigation, the Settlement's guarantee of substantial benefits in the form of the strong governance processes, policies, and procedures embodied in the Reforms is fair, reasonable, and adequate.

5.      The Company and its Board of Directors "acknowledge and agree that the Reforms confer substantial benefits on Faraday and Faraday's stockholders" (Stip., § V, ¶ 2.2), that Plaintiffs' efforts "were the cause of the adoption, implementation, and maintenance of the Reforms" (*Id.*), and "that it is in the best interests of Faraday for the Derivative Actions to be settled in the manner and upon the terms and conditions set forth in [the] Stipulation." *Id.*, § III. Thus, for the reasons discussed herein and in the Final Approval Memorandum, Plaintiffs believe the Settlement is a sound resolution of this complex derivative litigation and merits final approval in all respects.

---

[2]      This California Action, along with the four related stockholder derivative actions are collectively referred to as the "Derivative Actions." Plaintiffs Farazmand and Zhou, along with Plaintiffs John Moubarak, Shaobo Wang, and Christy Wallace in the Derivative Actions are collectively referred to as "Plaintiffs."

DECLARATION OF TIMOTHY BROWN IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTIONS FOR
FINAL APPROVAL OF SETTLEMENT AND FOR ATTORNEYS' FEES,
REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS

6.     As further discussed below and for the reasons explained in the Fee Memorandum, for achieving the Reforms, Plaintiffs' Counsel are entitled to an award of attorneys' fees and reimbursement of expenses under the substantial benefit doctrine, pursuant to the factors applied in the Ninth Circuit and in Delaware.

## II.     FACTUAL BACKGROUND

7.     The Derivative Actions each arise out of similar or common allegations following a business combination between Property Solutions Acquisition Corp. ("PSAC"), and Faraday's legacy business, ("Legacy FF") (the "Merger"). *See* Stip., §I. PSAC was formed as a public company with the purpose of acquiring a private company to take public and identified Legacy FF for a potential merger. On January 28, 2021, PSAC and Legacy FF issued a joint press release announcing that they had entered into an agreement to effectuate a business combination pursuant to which the surviving entity would become the publicly traded company now known as Faraday. ECF No. 25-2 (California Plaintiffs' Redacted Verified Consolidated Amended Shareholder Derivative Complaint filed on May 31, 2023 (the "Complaint")), ¶ 202.[3]

8.     On June 24, 2021, PSAC filed the Merger Proxy. The Merger Proxy was jointly solicited by the PSAC and Legacy FF Boards. ¶ 7. The Merger Proxy asked for shareholders to approve the Merger, along with certain other proposals. ¶¶ 209–210. The Merger Proxy, however, made a series of false and misleading statements and failed to disclose material adverse information to investors including, *inter alia*, regarding the Company's risk exposure, certain related party notes, the influence that Defendant Jia continued to have at the Company, despite contrary representations, and the true amount of reservations Legacy FF secured for its touted vehicle, the FF 91, and the inflated value of Legacy FF and the post-Merger entity. ¶¶ 209–30; *see also* ECF No. 67-1 at 13 and ECF No. 68-1 at 13 (California Plaintiffs' memoranda in opposition to motions to dismiss

---

[3]     Unless otherwise specified, references to "¶__" or "¶¶__" are to the Complaint.

3

filed November 22, 2023). Based on these allegedly false representations and material omissions, and other public filings, the Merger closed on July 21, 2021, resulting in extensive damage to the Company and improper enrichment for the Individual Defendants. *Id*. at 14; ¶ 40.

9. On October 7, 2021, less than three months after the Merger closed, J Capital Research issued a report, revealing, *inter alia*, troubling facts about Faraday's inability to execute its business plan, the inaccuracy of reported "reservations" for the Company's vehicle (the FF 91), that a significant number of deposits for the vehicle reservations were tied to one undisclosed Company affiliate, and Jia's continuing influence over Faraday. ¶¶ 233–36. In February 2022, the Company's internal investigation confirmed issues with internal controls over financial reporting, that only several hundred of the 14,000 touted vehicle reservations were paid, that representations about Jia's involvement within the Company were "inaccurate", and that Faradays "corporate culture failed to sufficiently prioritize compliance." ¶¶ 242-246.

10. The Derivative Actions allege that between January 28, 2021 and April 14, 2022, the Individual Defendants engaged in alleged misconduct, including breaches of duties, by, *inter alia*: making and/or causing the Company to make a series of materially false and misleading statements and omissions about Faraday's reservations, among other things; causing the Company to acquire Legacy FF on unfair terms, failing to maintain internal controls, and improperly soliciting proxy statements. ¶¶ 34-39; Stip., §I.

## III.  PROCEDURAL BACKGROUND AND SETTLEMENT

### A.    The California Action

11. On March 8, 2022, Plaintiff Farazmand filed a Verified Stockholder Derivative Complaint in this Court asserting claims for violations of Section 14(a), 10(b), and 21D of the Exchange Act of 1934, as well as for breach of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets,

originally captioned *Farazmand v. Breitfeld, et al.*, Case No. 2:22-cv-01570-CAS-JC (the
"*Farazmand* Action"). ECF No. 1. On March 21, 2022, Plaintiff Zhou filed a Verified
Stockholder Derivative Complaint also in this Court, asserting claims for violations of
Section 14(a), 10(b), and 21D of the Exchange Act of 1934, as well as for breach of
fiduciary duty, and aiding and abetting, captioned *Zhou v. Breitfeld, et al.*, Case No. 2:22-
cv-01852-CAS-JC (the "*Zhou* Action"). Stip., § I.B.

12.     On April 8, 2022, the Court consolidated the *Farazmand* Action and *Zhou*
Action and appointed The Brown Law Firm, P.C. as Lead Counsel for the California
Plaintiffs. ECF No. 14. Then, on May 23, 2022, the parties to this California Action
stipulated to stay the action pending the resolution of a motion to dismiss in the related
securities class action captioned *Zhou v. Faraday Future Intelligent Electric Inc., et al.*,
No. 2:21-cv-09914 (C.D. Cal.) ("Securities Class Action"), which the Court ordered on
May 24, 2022. ECF Nos. 20–21. Pursuant to the Court's Stay Order, Defendants would
provide California Plaintiffs with any documents produced to any Faraday stockholder
pursuant to a books and records request relating to the subject matter of the California
Action. *See id*. The stay expired in February 2023 pursuant to the parties' stipulations and
related orders. *See* ECF Nos. 20, 21, 24.

13.     Between December 2022 and June 2023, the California Plaintiffs received
confidential documents from Defendants, which California Plaintiffs reviewed and
incorporated into the Complaint. ECF No. 29. Defendants filed four separate motions to
dismiss the Complaint on September 15, 2023, (ECF Nos. 41, 43, 45-46, 48), and the
California Plaintiffs filed their consolidated opposition on November 22, 2023. *See* ECF
Nos. 65-72. The parties in the California Action presented oral arguments before the Court
during a virtual hearing on January 22, 2024. ECF Nos. 90, 93. The same day, the Court
issued an order granting in part and denying in part the motions to dismiss, with leave to
amend.

14.     On February 12, 2024, the California Action, including California Plaintiffs' deadlines to file their anticipated motion to reconsider the Court's motion to dismiss order and to amend the Complaint, was stayed pending the parties' agreement to participate in a mediation, which ultimately took place on May 13, 2024. ECF Nos. 94, 95. In June 2024, the parties in the California Action provided updates to the Court about the Mediation and ultimate settlements, discussed below. Stip., §I.B.

**B.    The Delaware Federal Actions**

15.     On April 11, 2022, Plaintiff Moubarak filed a Verified Stockholder Derivative Complaint in the U.S. District Court for the District of Delaware asserting claims for violations of Section 14(a), 10(b), and 21D of the Securities Exchange Act of 1934, as well as for breach of fiduciary duty, aiding and abetting, and waste of corporate assets. Stip., § I.C. On April 25, 2022, Plaintiff Wang filed a Verified Stockholder Derivative Complaint in the same Court, asserting claims for violations of Section 14(a), 10(b), and 21D of the Securities Exchange Act of 1934, as well as for breach of fiduciary duty, and unjust enrichment. Stip., § I.D.

16.     On February 3, 2023, the parties in these Delaware federal cases agreed to stay their actions pending the outcome of any summary judgment motion filed in the related Securities Class Action, which was so-ordered on February 6, 2023. Stip., at 7-8. During the stay, and upon the execution of a confidentiality agreement, Plaintiffs Moubarak and Wang both received confidential documents from the Company that were produced in response to a books and records demand made by a stockholder pursuant to 8 *Del. C.* § 220 ("Section 220"). Stip., §§ I.C–D.

**C.    The Wallace Action**

17.     On January 3, 2023, Plaintiff Wallace served an inspection demand pursuant to Section 220 on the Company for books and records. Faraday produced the documents on or around March 1, 2023. Stip., § I.E. Then, on May 17, 2023, Plaintiff Wallace sent a

letter to the Board, demanding that the directors investigate and bring claims for breach of fiduciary duty against the Individual Defendants on behalf of the Company. Within nine days, the Board rejected the litigation demand. *Id*. On June 21, 2023, Plaintiff Wallace filed a Verified Stockholder Derivative Complaint in the Delaware Court of Chancery asserting claims for breach of fiduciary duty, unjust enrichment, and contribution and indemnification. *Id*. On August 9, 2023, certain of the defendants filed a motion to dismiss or, in the alternative, to stay, and on August 23, 2023, defendant J. Vogel moved to dismiss. *Id*. The parties to the *Wallace* Action stipulated to stay the action pending the outcome of the motions to dismiss in the California Action and the final adjudication of the settlement in the Securities Class Action, which was granted by the Court on December 29, 2023. *Id*.

**D.    The Delaware Chancery Action**

18.    In connection with briefing the motions to dismiss in this California Action, the California Plaintiffs consented to Defendants' request to sever their state law claims so that those claims could be pursued before the Delaware Court of Chancery. On December 22, 2023, Plaintiffs Farazmand and Zhou filed their Verified Stockholder Derivative Complaint in the Court of Chancery asserting claims for breach of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and aiding and abetting. On January 16, 2024, Defendants filed a motion to dismiss the Delaware Chancery Action. Stip., § I.F.

**E.    Settlement Negotiations**

19.    Counsel for the Parties engaged in extensive efforts to resolve the Derivative Actions. *See* Stip., § I.G. Plaintiffs in each of the Derivative Actions sent confidential settlement demands proposing corporate governance reforms designed to address the governance deficiencies that led to the Derivative Actions. *Id*. On December 22, 2023, Plaintiffs sent a joint settlement demand to Defendants that superseded their respective

DECLARATION OF TIMOTHY BROWN IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTIONS FOR
FINAL APPROVAL OF SETTLEMENT AND FOR ATTORNEYS' FEES,
REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS

earlier settlement demands.   The Parties thereafter continued a dialogue regarding a potential settlement, including exchanging multiple drafts proposing corporate governance remedials. *Id.*

20.    On May 6, 2024, in anticipation of the Mediation, the Parties exchanged mediation statements with each other and submitted the same to the Mediator. *Id.* On May 13, 2024, the Parties attended an all-day hybrid mediation that took place in Los Angeles, California, overseen by the Mediator.   During the mediation, the Parties, with the assistance of the Mediator, engaged in hard fought, arm's-length, settlement negotiations. Throughout, the Parties exchanged proposals and counter-proposals, evaluated information shared by Defendants, and challenged each other's theories, allegations, and contentions of law and fact. Ultimately, the Parties were able to reach an agreement in principle on the material substantive consideration for the Settlement and executed a memorandum of understanding reflecting the substantive terms of the settlement by the end of the Mediation. *Id.*

21.    After reaching agreement on the material substantive terms of the Settlement, the Parties, with the Mediator's aid, separately negotiated the attorneys' fees and expenses that would be payable to Plaintiffs' Counsel commensurate with the Settlement's substantial benefits. Through a series of offers and counteroffers, the Parties agreed upon $775,000 (the "Fee and Expense Amount"), to include $2,000 service awards for each Plaintiff, subject to Court approval. Stip., § I.G; § V, ¶ 4.

**F.    Preliminary Approval and Notice of Settlement**

22.    On September 3, 2024, the Court entered the Preliminary Approval Order. ECF No. 105.  Pursuant thereto, on September 13, 2024, Faraday published the Summary Notice in a press release, and filed the Notice, with a copy of the Stipulation (and exhibits thereto), as exhibits to an SEC Form 8-K. *See* ECF No. 106, ¶¶ 3-4. The Notice contained a detailed history of the Derivative Actions and proposed Settlement, the claims that will

be released if the proposed Settlement is approved, and the agreed Fee and Expense Amount to be paid to Plaintiffs' Counsel, subject to Court approval. The Notice also provided a link to the Investor Relations page on Faraday's website, where on September 13, 2024, Faraday had posted the Notice and Stipulation (and exhibits thereto), and which posting will be maintained through the date of the Settlement Hearing. *Id.*, ¶ 2. Pursuant to the Preliminary Approval Order, the Notice directed that any objections to the Settlement be filed by October 14, 2024. To date, the Parties have not received and are not aware of any objections to the Settlement.

## IV.    TERMS OF THE SETTLEMENT

23.    The Settlement addresses the core concerns raised in the Derivative Actions and offers Faraday and its stockholders the benefit of substantial, immediate, and lasting corporate governance reforms. Specifically, the Reforms: (i) create a management-level Disclosure Committee to help ensure that all public statements to be made by the Company, its officers, and/or its directors referencing product development, technology, manufacturing, marketing, and operations capabilities, goals or production targets are full, fair, and accurate (Reforms, ¶ A); (ii) formalize a policy setting forth the duties and responsibilities of Faraday's Compliance Officer to help ensure the Company's and management's compliance with all laws and regulations and to enhance risk management (*Id.*, ¶ B); (iii) establish a compensation recoupment policy that empowers the Compensation Committee to review, and consider, management's compliance with the Company's internal guidelines and policies in setting incentive-based compensation (*Id.*, ¶ C); (iv) require the appointment of a Lead Independent Director in instances where the CEO and Chair of the Board are the same person, to further enhance the Board's independence (and establish defined responsibilities for such Lead Independent Director) (*Id.*, ¶ E); (v) amend the Audit Committee Charter to add certain risk management responsibilities which shall protect against the recurrence of the alleged wrongdoing in the

future (*Id.*, ¶ F); (vi) amend the Whistleblower Policy to further enhance accountability within the Company and to provide employees with a formal and effective mechanism by which they can report any ethical, legal, or internal policy violations (*Id.*, ¶ G); (vii) enhance the Related Party Transaction policy to ensure compliance with SEC and NYSE/NASD guidance and to ensure director independence (*Id.*, ¶ H); and (viii) mandate annual employee training to ensure adherence with the Company's ethical standards (*Id.*, ¶ D). Faraday and its Board agree that the Reforms, which shall be in place for at least three (3) years provide substantial benefits to Faraday and its stockholders.

## V.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

### A.    The Settlement Merits a Presumption of Fairness Because It Is the Product of Arm's-Length Negotiations by Experienced and Well-Informed Counsel With the Assistance of a Skilled Mediator

24.    The presumption of fairness applies here because the Settlement is the product of extensive arm's-length negotiations by well-informed, skilled, and experienced counsel, with the assistance and oversight of a skilled Mediator.

25.    The Parties' negotiations included extensive discussions and countless revisions to a corporate governance term sheet, regarding Faraday's existing governance structure and necessary governance enhancements for any settlement. *See* Stip., §II, ¶ G. The negotiations were conducted by highly qualified counsel that have litigated scores of shareholder derivative actions to successful resolution, and whose lawyers are nationally recognized as leaders in the field of shareholder rights litigation.  Copies of the firm resumes of The Brown Law Firm, P.C., Gainey McKenna & Egleston, Hynes & Hernandez, LLC, Bragar, Eagel & Squire P.C., and Schubert Jonckheer & Kolbe LLP are attached to the accompanying fee declarations of each firm, which are attached hereto as Exhibits 1, 2-1, 3-A, 4-A, & 5-A,  respectively. Troutman Pepper and Latham & Watkins LLP, nationally recognized corporate defense firms, represent the Defendants in the Derivative Actions and also served as defense counsel in the Securities Class Action.  As

DECLARATION OF TIMOTHY BROWN IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTIONS FOR
FINAL APPROVAL OF SETTLEMENT AND FOR ATTORNEYS' FEES,
REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS

such, the settlement negotiations were conducted not only at arm's-length, but by some of the most knowledgeable attorneys regarding shareholder litigation and this case. This further supports a presumption that the Settlement is fair and reasonable.

26.    Plaintiffs and their counsel acted on an informed basis in negotiating the Settlement.  Specifically, by and through Plaintiffs' Counsel, Plaintiffs engaged in extensive investigation, and other litigation efforts throughout the prosecution of the Derivative Actions and have accumulated sufficient information discovered through these efforts to be well-informed about the strengths and weaknesses of the Derivative Actions and to engage in effective settlement discussions with Defendants.  These efforts by Plaintiffs included, among other things: (i) reviewing and analyzing Faraday's press releases, public statements, and filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) reviewing and analyzing securities analysts' reports and advisories and media reports about the Company; (iii) reviewing and analyzing the pleadings and orders in the Securities Class Action; (iv) researching the applicable law with respect to the claims alleged and the potential defenses thereto; (v) preparing and filing initial complaints in the Derivative Actions; (vi) researching and evaluating factual and legal issues relevant to the claims; (vii) reviewing thousands of pages of confidential internal corporate documents produced by Defendants; (viii) preparing and filing an amended complaint in the California Action; (ix) researching and drafting the opposition to the four motions to dismiss filed in the California Action and attending oral argument; (x) engaging in settlement negotiations with Defendants' counsel regarding the specific facts, and perceived strengths and weaknesses of the Derivative Actions, and other issues in an effort to facilitate negotiations; (xi) researching the Company's corporate governance structure in connection with settlement efforts; (xii) preparing comprehensive written settlement demands and modified demands over the course of the Parties' settlement negotiations; (xiii) preparing a mediation statement; (xiv) participating in the full-day Mediation held

on May 13, 2024; and (xv) negotiating and drafting the Stipulation, which forms the basis of the Settlement. Stip., § II.

27.    All counsel possessed a firm understanding of the strengths and weaknesses of their respective claims and defenses while negotiating and before agreeing to the Settlement.

28.    Moreover, the settlement negotiations were overseen and materially assisted by the Mediator, further demonstrating the fairness of the settlement process.

29.    The Parties did not begin negotiating the amount of fees and expenses payable to Plaintiffs' Counsel until after all of the material terms of the Settlement were agreed upon, further demonstrating the fairness of the arm's-length Settlement.

30.    Courts also traditionally afford substantial deference to directors' exercise of independent business judgment.   Here, the independent members of Faraday's Board approved a resolution reflecting its determination that the Settlement, and separately, the Reforms, are in the best interest of Faraday. Stip., § IV.

**B.    The Settlement Confers Substantial Benefits on Faraday and its Shareholders**

31.    The Settlement achieves for Faraday and its stockholders the substantial benefit of numerous reforms that will materially improve the Company's corporate governance. *See* Stip., Ex. A.  The bulk of the allegations in the Derivative Actions stem from failures of the Company regarding risk management, compliance and disclosure controls, which in turn led to the propagation of misleading information regarding Faraday and Legacy FF.   The Reforms directly address the allegations and further improve Faradays' corporate governance, generally, which form the basis of the Derivative Actions, to include, *inter alia*, well-targeted fail-safes to address these alleged deficiencies:

32.    The creation of a new management-level Disclosure Committee (Reforms, ¶ A), will improve the effectiveness of oversight and ensure that Faraday's disclosures are complete, fair, true and compliant with applicable rules and regulations so that investors,

and those at the Company, including members of the Audit Committee who will receive regular reports from the Disclosure Committee, are adequately informed about Faraday's business, risk exposure, and other material information.

33.    The appointment and responsibilities of a Lead Independent Director where the CEO and Chair of the Board are the same person, (Reforms, ¶ E), will ensure that those leading the Board's oversight of management is not part of management. When these offices are not separated and/or a Lead Independent Director is not in place, it is often due to the power of the Chairman/CEO, rather than good governance.

34.    The enhancements to the duties and responsibilities of the Audit Committee (Reforms, ¶ F), among other things, provide for increased oversight of risk management, improving the propriety of Faraday's material risk relating to compliance and the accuracy of related public statements.

35.    The Settlement also requires a formal policy setting forth the duties and responsibilities of the Compliance Officer, which will significantly enhance Faraday's compliance controls. *Id*., ¶ B.  These duties will include overseeing the Company's compliance and ethics framework and keeping the Board up-to-date; communicating with regulatory agencies to ensure that Faraday is compliant with applicable laws; coordinating regulatory risk assessments faced by Faraday and recommending business operation improvements; and acting as the liaison between management and the Board to report any material risk regarding compliance and disclosure.  This goes hand in hand with another Settlement provision which requires Faraday employees to annually attest that they will comply with Faraday's Code of Business Conduct and Ethics. *Id*., ¶ D.  Collectively, these reforms will increase information flow from those involved in day-to-day operations through senior management and up to the Board and reduce the risk of liability from failures regarding compliance and disclosure.

13

36.    The Settlement also provides an enhanced compensation recoupment policy which requires the Compensation Committee to annually review management's compliance with the Company's internal policies and ensures the Compensation Committee considers the results of this review in setting all incentive-based compensation arrangements. Reforms, ¶ C.

37.    The improvements to Faraday's Whistleblower Policy include stringent requirements to notify employees of their rights to bring forward legal violations and violations of Faraday's internal policies.  A log of whistleblower complaints shall also be maintained for 5 years and Faraday's external auditor shall review the log and any investigation that results in connection with each annual audit. These improvements will reduce the likelihood of improper behavior, like that alleged in the Derivative Actions, and help assure employees and investors that the Company is committed to adhering to its ethical and legal obligations. Reforms, ¶ G.

38.    Lastly, the Settlement requires that Faraday's new Related Person Transaction Policy comply with SEC and NYSE/NASD guidance (a process to be overseen by the Audit Committee) and all officers and directors shall submit to the Compliance Officer an up-to date list of companies in which they are a director, an officer, and/or in which they own a controlling interest, and promptly update the list when any changes occur. *Id.*, ¶ H. Thus, decisions by Company insiders can be properly evaluated if there is a possibility of a conflict of interest.

39.    Taken together, the Reforms in the Settlement directly address the alleged wrongdoing in the Derivative Actions and provide immediate and substantial benefits to the Company that far outweigh the speculative potential of any monetary recovery that may or may not be realized years down the road through continued litigation.  Indeed, the Company and its Board of Directors "acknowledge and agree that the Reforms confer substantial benefits on Faraday and Faraday's stockholders" (Stip., § V, ¶ 2.2), that

Plaintiffs' efforts "were the cause of the adoption, implementation, and maintenance of the Reforms" (*Id*.), and "that it is in the best interests of Faraday for the Derivative Actions to be settled in the manner and upon the terms and conditions set forth in [the] Stipulation." *Id*., § III.

40.    The Settlement also requires Faraday to maintain the Reforms for at least three years—enough time for them to become embedded in Faraday's corporate culture and governance practices.  Stip., § V, ¶ 2.1.

41.    Additionally, the Reforms confer significant economic value to Faraday. While it would be difficult to estimate the value of these benefits with precision, they are no less real and substantial. Research by academics and leading business advisors confirms that investors pay a premium for stock in companies with strong corporate governance relative to peer companies perceived to have weaker governance because strong governance correlates with long-term value creation. *See* Ex. 6, L. Bebchuk & A. Hamdani, *The Elusive Quest for Global Governance Standards*, 157 U. Pa. L. Rev. 1263, 1266 (2009) ("There is now widespread acceptance that adequate investor protection can substantially affect not only the value of public firms and their performance but also the development of capital markets and the growth of the economy as a whole."); Ex. 7, Robert Adamson, *Corporate Governance, Risk Management and Corporate Social Responsibility in Emerging Markets: A Symbiotic Relationship*, Corporate Governance & Risk Management Blog, Simon Fraser University, Beedie School of Business (Mar. 22, 2011) ("Investors, particularly large institutional investors, are … focused on corporate governance[.]… Paying attention to corporate governance issues is becoming an important part of investment decisions[.]" ).

42.    Numerous studies have confirmed that investors are willing to pay a premium for stock in well-governed corporations, thus driving substantial increases in long-term stockholder value. *See* Ex. 8, P. Gompers, J. Ishii & A. Metrick, *Corporate Governance*

DECLARATION OF TIMOTHY BROWN IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS

*and Equity Prices*, 118 Quarterly J. Econ. (2003); Ex. 9, Lawrence D. Brown & Marcus L. Caylor, *The Correlation Between Corporate Governance and Company Performance*, Institutional Shareholder Services (2004); Ex. 10, V. Cunant, M. Gina & M. Guadalupe, *The Vote Is Cast: The Effect of Corporate Governance on Shareholder Value*, 67 J. Finance 68 (Oct. 2012). McKinsey & Company sought to quantify this effect in a survey of more than 200 large institutional investors with more than a combined $3.25 trillion under management. *See* Ex. 11, *McKinsey & Company Investor Opinion Survey*, McKinsey & Company (June 2000). Respondents were asked to consider investments in two companies, both of which had performed well in the past but had run into trouble. Based on numerous attributes, one company had strong governance, while the other did not. Seventy-five percent of those responding ranked governance attributes as more important than financial issues, and 80% said they would pay substantially more for the company with strong governance. The U.S. respondents were willing to pay an average premium of 18.3%. Based on these results, McKinsey & Company concluded that while "it remains difficult to measure the impact on market prices of the premium investors say they are willing to pay for well-governed companies, the amounts they are prepared to pay leave little doubt that good governance does feed through"—"[i]f companies could capture but a small portion of the governance premium that is apparently available, they would create significant shareholder value." *Id.*

**C.  Continued Litigation Would Be Risky, Costly, and Time-Consuming**

43.    The Settlement guarantees the foregoing substantial benefits and avoids the uncertainty, risks, costs, and delays in attempting to improve upon the result through further litigation.  These concerns are particularly significant in complex stockholder derivative litigation.  The likely complexity, expense, and duration of further litigation, and the significant risk that it would produce no benefit at all for Faraday weigh strongly in favor of final approval here.

44.     There is no question that derivative actions are fraught with risk.  The odds of winning a derivative suit are extremely small, and a derivative failure of oversight claim—one of the type of breach claims brought by Plaintiffs here—is possibly the most difficult theory in corporation law for a derivative plaintiff to successfully prosecute.  Here, Plaintiffs had encountered that risk. Specifically, the California Plaintiffs in the California Action had already their federal claims dismissed in part under Rule 23.1 at the motion to dismiss stage (*see* ECF No. 93), and while California Plaintiffs intended to move for reconsideration as to that issue, there was the very real possibility that they might not be successful.  Regardless, assuming any of the Plaintiffs could satisfy Rule 23.1, they would still face challenges from Defendants as to whether they adequately stated claims under Rule 12(b)(6) (as to the state law claims that have not yet been considered on their merits by any court) and if unsuccessful, further challenges may ensue in the form of motions for reconsideration or appeals.

45.     If Plaintiffs defeated those motions, litigation would be extremely complex, costly, and of substantial duration.  Document discovery would need to be conducted, depositions would need to be taken, experts would need to be designated, and expert discovery conducted.  Motions for summary judgment would have to be briefed and argued and a trial would have to be held.  The Individual Defendants would likely continue to assert that their conduct was protected by the business judgment rule, which creates the powerful presumption that the Board and management acted in the best interests of the Company.  This presumption, applicable to most derivative actions, would have been even harder to rebut in the Actions because the issues involve exceedingly complex matters of regulatory law relating to the Company's duty to disclose financial information concerning accounting, metrics, and financial prospects.   The possibility that this protective umbrella could have shielded the Individual Defendants made establishing liability in the Derivative Actions uncertain, at best.

46.     Even if liability was established, the amount of recoverable damages would still have posed significant issues and would have been subject to further litigation. And it is not clear or certain what amount of damages or corporate governance reforms Plaintiffs could achieve on behalf of Faraday at any trial.  Under traditional applications of Delaware law, Plaintiffs faced a formidable challenge establishing and collecting monetary damages in the Derivative Actions.  While Faraday may have suffered losses as a result of the conduct challenged in the Derivative Actions, the question of whether it suffered legal, non-exculpated damages is a more complicated question.

47.     Undoubtedly, the issue of damages to Faraday would have been hotly disputed and the subject of expert testimony proffered by all parties.  The damages assessments of experts retained by the parties would surely vary substantially, and the assessment of this crucial element of Plaintiffs' respective claims would likely be reduced at trial to a "battle of the experts."  It is far from certain that a jury would have disregarded Defendants' experts' opinions. Indeed, defense experts seeking to establish that damages were caused by factors other than Defendants' wrongdoing, or, alternatively, trying to minimize the amount of the Company's damages, might very well sway a jury.  A jury could find that there were no damages at all, or that damages were a fraction of the amount asserted by Plaintiffs.

48.     Even victory at trial is no guarantee that the judgment would ultimately be sustained on appeal or by the trial court.  Add to these post-trial and appellate risks, the difficulty and unpredictability of a lengthy and complex trial—where witnesses could suddenly become unavailable or the fact finder could react to the evidence in unforeseen ways—and the benefits of the Settlement become all the more apparent.  The Settlement eliminates these and other risks of continued litigation, including the very real risk of no recovery after years of litigation, while providing the Company and its stockholders substantial benefits now.  The immediate implementation of the Reforms is far more

favorable than the costly, uncertain, and time-consuming process of seeking to obtain a better recovery through further litigation.

49.     Even setting aside the significant risks inherent in proceeding, the expense and likely duration of the Derivative Actions would yield diminishing returns for the Company.  The Settlement's immediate, certain, and substantial benefits of the significant reforms to the Company's corporate governance are preferable to pursuing years of uncertain litigation in the speculative hope of obtaining an even better result down the road.

**D.    The Reaction of Faraday Shareholders Further Supports Final Approval of the Settlement**

50.     The deadline for Faraday shareholders to object to the proposed Settlement is October 14, 2024.  To date, counsel has not heard from any stockholders indicating that they are not satisfied with the Settlement.  Even where a handful of objections are made, this factor weighs in favor of approval.

**VI.    THE NEGOTIATED FEE AND EXPENSE AMOUNT IS FAIR AND REASONABLE**

51.     Plaintiffs' Counsel's efforts prosecuting the Derivative Actions on Faraday's behalf and achieving the Settlement unquestionably conferred "substantial benefits" upon the Company and its stockholders. *See* Stip., § V, ¶ 2.2. Accordingly, and in consideration of the significant corporate governance reforms, which Faraday has agreed to implement and maintain, pursuant to the Settlement and as a direct result of Plaintiffs' and Plaintiffs' Counsel's efforts, Defendants' insurers agreed to pay to Plaintiffs' Counsel attorneys' fees and expenses in the amount of $775,000, subject to Court approval. Stip., § V, ¶ 4.1. Significantly, it was only after the Parties reached an agreement in principal on the material terms of the settlement, that the Parties separately negotiated this Fee and Expense Amount at arm's-length and with substantial assistance from the Mediator. Stip., §I, G. California Plaintiffs respectfully submit that the Fee and Expense Amount is fair and reasonable under all relevant factors and should be approved.

**A.    The Agreed-To Fee and Expense Amount Merits Substantial Deference**

52.    The U.S. Supreme Court has endorsed the consensual resolution of attorneys' fees as the ideal towards which litigants should strive. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Where there is no evidence of collusion, courts accord substantial deference to fee and expense amounts determined by the parties. *See Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001) (affording "substantial weight to a negotiated fee amount"); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 861 (E.D. Mo. 2005) ("where . . . the parties have agreed on the amount of attorneys' fees and expenses, courts give the parties' agreement substantial deference").

53.    The Parties mutually determined the Fee and Expense Amount. These negotiations occurred after agreeing in principle on the Settlement's material substantive terms, including the Reforms; were conducted at arm's length with the assistance of the experienced Mediator; and (subject to Court approval) will be paid "[i]n consideration of the substantial benefits conferred upon Faraday as a direct result of the Reforms and Plaintiffs' and Plaintiffs' Counsel's efforts in connection with the Derivative Actions." Stip., § I,G; § V, ¶4.1. The Settlement—including the Fee and Expense Amount—enjoys the full support of the Company and its Board as being "in the best interest of Faraday." Stip., § IV.[4] Both sides agree that $775,000 is a fair and reasonable sum.

54.    Unlike fee awards in securities class actions, this Court is not being called upon to fashion a fee award from scratch. Rather, the Court need only determine whether the amount of the Fee and Expense Amount agreed upon by the sophisticated Parties represented by experienced counsel in arm's-length negotiations, conducted with the assistance of the reputable Mediator after the Settlement's substantive terms had been determined, falls within the range of reasonableness. Further, unlike in class actions,

---

[4]    *See also* Stip., § III (Defendants have "determined that it is in the best interest of Faraday for the Derivative Actions to be settled in the manner and upon the terms and conditions set forth in this stipulation").

DECLARATION OF TIMOTHY BROWN IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS

where the diverging interests of counsel and class members may warrant scrutiny when defendants agree not to oppose fee applications "up to" a certain amount, here the Parties reached agreement on the actual Fee and Expense Amount in negotiations where the real party in interest (Faraday) was represented by counsel and had every incentive to negotiate the lowest reasonable fee. Thus, the Parties' conclusion that the agreed-upon Fee and Expense Amount is fair and reasonable is entitled to substantial deference under applicable case law, and the Court need not engage the traditional methods used to calculate an award.

55.    As the Ninth Circuit has explained, "the court's intrusion upon what is otherwise a private consensual agreement between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties," and "taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice v. Civil Serv. Com.*, 688 F.2d 615, 625 (9th Cir. 1982). *See also In re Apple Computer, Inc. Derivative Litig.*, 2008 WL 4820784, at *3 (N.D. Cal. Nov. 5, 2008) ("A court should refrain from substituting its own value for a properly bargained-for agreement.")

56.    The Parties mutually determined the Fee and Expense Amount, negotiating the proposed $775,000 amount to be paid in recognition of the substantial benefits achieved through the Settlement only after agreeing in principle on its substantive terms. These negotiations were conducted at arm's length with the assistance of the experienced Mediator, were focused on the value of the Settlement benefits to Faraday and its stockholders, and were informed by careful assessment of fee awards in comparable cases in the Ninth Circuit, Delaware, and other leading jurisdictions. Thus, the Fee and Expense Award is entitled to "significant deference." *In re OSI Sys., Inc. Derivative Litig.*, 2017 WL 5642304, at *5 (C.D. Cal. May 2, 2017); *Allred v. Walker*, 2021 WL 5847405, at *5 (S.D.N.Y. Dec. 9, 2021).

**B.    A Fee Award Is Warranted Under the Substantial Benefit Doctrine**

57.    Under the "substantial benefit" doctrine, counsel who successfully prosecute a stockholder derivative action are entitled to attorneys' fees and expenses in reasonable proportion to the value of the substantial benefits achieved. *See Mills v. Elec. Auto-Lite Co.,* 396 U.S. 375, 394-96 (1970). It is well-settled that the "substantial benefits" obtained for the company need not be monetary. As explained in *Mills*, "a corporation may receive a 'substantial benefit' from a derivative suit, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature." *Id.*, at 395. And "private stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to all stockholders[.]" *Id.* at 396.

58.    Here, Plaintiffs' Counsel's diligent work yielded substantial benefits of significant value that unquestionably warrant attorneys' fees. Indeed, Faraday and its Board agree that the Reforms "confer substantial benefits on Faraday and Faraday's stockholders," and that Plaintiffs' litigation efforts "were the cause of the adoption, implementation, and maintenance of the Reforms." Stip., § V, ¶ 2.2; *see also* Stip., § V, ¶ 4.1 (proposed Fee and Expense Amount will be paid, subject to Court approval, "[i]n consideration of the substantial benefits conferred upon Faraday as a direct result of the Reforms and Plaintiffs' and Plaintiffs' Counsel's efforts in connection with the Derivative Actions").

**C.    Other Factors Confirm the Reasonableness of the Negotiated Award**

i.    The Fee and Expense Amount is Reasonable Relative to the Value of the Settlement Benefits and Compared to Similar Settlements.

59.    As discussed above, the Reforms confer substantial benefits with real value, which likely exceed the agreed-to Fee and Expense Amount by an order of magnitude. *See In re Schering-Plough Corp. S'holders Derivative Litig.*, 2008 WL 185809, at *5-6 (D.N.J. Jan. 14, 2008) (approving $9.5 million fee) ("The adoption of the corporate

governance and compliance mechanisms required by the settlement can prevent breakdowns in oversight that would otherwise subject the company to risk of regulatory action, or uncover and remedy a problem at the early stages before it becomes the subject of a government investigation. Effective corporate governance can also affect stock price by bolstering investor confidence and improving consumer perceptions.").

60.   The agreed Fee and Expense Award amount compares favorably to fees approved in derivative settlements with similar relief, confirming its reasonableness:

- *In re Zuora, Inc. Derivative Litig.*, Case No. 3:19-cv-05701-SI, slip op. (N.D. Cal. Sept. 18, 2023) (approving $2 million fee award for settlement amending disclosure committee charter to expand its responsibilities, creating chief compliance officer and chief technology officer positions, broadening audit committee obligations, and enhancing the company's whistleblower policy, among other reforms) (Exs. 12 & 13).

- *In re RTI Surgical Derivative Litig.*, 2022 U.S. Dist. LEXIS 96385, at *3 (N.D. Ill. Jan. 24, 2022) (approving $1.5 million fee award for settlement establishing management-level disclosure committee, expanding audit committee responsibilities, requiring the appointment of a lead independent director where the CEO and board chair are the same person, and changes to the company's whistleblower policy, among other reforms) (Ex. 14).

- *In re Cell Therapeutics, Inc. Derivative Litig.*, Case No. 2:10-cv-00564-MJP, slip op. (W.D. Wash. May 31, 2013) (approving $1.3 million fee award for settlement creating a charter for the disclosure committee and expanding its duties, broadening the duties of the chief compliance officer, creating a chief governance officer position, and enhancing the company's whistleblower policy, among other reforms) (Exs. 15 & 16).

- *In re Inovio Pharms. Derivative Litig.*, Case No. 2:20-cv-01962-GJP, slip op. (E.D. Pa. Oct. 11, 2023) (approving $1.175 million fee award for settlement creating a disclosure committee policy, establishing a science review and oversight committee, creating a chief compliance officer position, expanding audit committee responsibilities, and enhancements to the company's whistleblower policy, among other reforms) (Exs. 17 & 18).

- *In re RH S'holder Derivative Litig.*, Case No. 4:18-cv-02452-YGR, slip op. (N.D. Cal. Dec. 18, 2020) (approving $1 million fee award for settlement creating a charter for the disclosure committee, providing for greater audit

committee oversight, setting duties for the chief compliance officer, and changes to the company's whistleblower policy, among other reforms) (Ex. 19).

- *In re Babcock & Wilcox Enters., Inc. S'holder Derivative Litig.*, Case No. 3:18-cv-00347-MOC-DCK, slip op. (W.D.N.C. Dec. 19, 2019) (approving $1 million fee award for settlement amending disclosure committee charter to expand its responsibilities and broadening audit committee obligations, among other reforms) (Exs. 20 & 21).

- *In re Synchrony Fin. Derivative Litig.*, Case No. 3:19-cv-00130-VAB, slip op. (D. Conn. Apr. 5, 2024) (approving $885,000 fee award for settlement improving management-level disclosure committee, amending the risk and audit committee charters to expand their responsibilities, expanding the duties of the company's chief credit and chief risk officers, and enhancing the company's ombuds policy, among other reforms) (Exs. 22 & 23).

- *In re Synchronoss Techs., Inc. S'holder Deriv. Demand Refused Litig.*, 2021 U.S. Dist. LEXIS 238014, at *28-33, 41 (D.N.J. Dec. 13, 2021) (approving $800,000 fee award for settlement establishing management-level disclosure committee, setting duties for the chief compliance officer, and enhancing audit committee responsibilities, among other reforms).

ii.    <u>Plaintiffs' Counsel Provided High Caliber Representation</u>

61.    Derivative litigation is notoriously complex and difficult. Plaintiffs' Counsel's skill and experience[5] were amply demonstrated here by their ability to coordinate their efforts across five related shareholder actions, critically evaluate the available public and non-public documentary evidence (including thousamds of pages of of internal documents produced by Defendants), prepare well-supported litigation positions to generate meaningful settlement leverage, and develop and negotiate a strong remedial package that all Parties agree confers substantial benefits upon Faraday and its stockholders. They did so while minimizing unnecessary expenditures of resources by

---

[5]    Plaintiffs' Counsel have decades of experience successfully litigating complex derivative and class actions and have achieved significant results for companies and stockholders across the country. *See* Plaintiffs' Counsel's firm resumes, Exs. 1, 2-A, 3-A, 4-A, & 5-A.

1  Faraday, the real party in interest in the Derivative Actions. Defendants were well-
2  represented by Troutman Pepper Hamilton Sanders LLP, Latham & Watkins LLP, and
3  Quinn Emanuel Urquhart & Sullivan LLP, who ably defended their clients' interests.
4  Together, these circumstances strongly weigh in favor of approving the Fee and Expense
5  Amount.

6            iii.    Plaintiffs' Counsel Bore Significant Contingency Risk

7        62.    The agreed-to Fee and Expense Amount is especially reasonable given
8  Plaintiffs' Counsel's significant risk of nonpayment. The Derivative Actions were
9  extremely risky. Plaintiffs' Counsel pursued the Derivative Actions on a fully contingent
10 basis knowing that they would likely devote hundreds of hours of hard work to the
11 prosecution of a difficult case, without any assurance of receiving any fees or
12 reimbursement of their out-of-pocket expenses. This risk grew over time as Plaintiffs'
13 Counsel invested more time and effort in the Derivative Actions to ensure Faraday a
14 meaningful recovery, including when the Court granted in part Defendants' motion to
15 dismiss the California Action on January 22, 2024 (ECF No. 93). Had litigation continued,
16 there was a very real prospect that Defendants could have defeated Plaintiffs' claims at
17 the pleading stage or on the merits, and in turn, that Plaintiffs' Counsel efforts would go
18 entirely uncompensated. These risks and the benefits secured for Faraday and its
19 shareholders thus fully justify the Fee and Expense Amount.

20           iv.    Plaintiffs' Counsel Invested Significant Time and Expenses

21               (a)    *The Brown Law Firm's Time and Expenses*

22       63.    My firm seeks attorneys' fees and reimbursement of expenses for the work
23 performed as counsel for the California Plaintiffs in the California Action in connection
24 with our role in achieving the proposed Settlement before this Court. My firm undertook
25 this representation on a wholly contingent basis, with the understanding that we would

26
27
28

DECLARATION OF TIMOTHY BROWN IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTIONS FOR
FINAL APPROVAL OF SETTLEMENT AND FOR ATTORNEYS' FEES,
REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS

receive no compensation, and our out-of-pocket expenses would not be reimbursed, unless our efforts resulted in the recovery of a substantial benefit for Faraday.

64.     My firm actively engaged in the prosecution of the California Action and the Delaware Chancery Action. The services undertaken by my firm in connection with this litigation included, among other things: (1) reviewing and analyzing Faraday press releases, public statements, and filings with the SEC; (2) reviewing and analyzing securities analysts' reports and advisories and media reports about the Company; (3) reviewing and analyzing the pleadings and orders in the Securities Class Action; (4) researching the applicable law with respect to the claims alleged and the potential defenses thereto; (5) preparing and filing the initial complaint in the California Action and later working with counsel on consolidation and the appointment of leadership; (6) separately preparing and filing the initial complaint in the Delaware Chancery Action; (7) researching and evaluating factual and legal issues relevant to the claims in each of the California Action and the Delaware Chancery Action; (8) reviewing thousands of pages of confidential internal corporate documents produced by Defendants; (9) preparing, filing and moving to seal an amended complaint in the California Action that incorporated confidential information gleaned from California Plaintiffs' review of internal Company documents; (10) researching and drafting a consolidated opposition to the four motions to dismiss filed in the California Action and attending oral argument; (11) engaging in settlement negotiations with Defendants' counsel regarding the specific facts, and perceived strengths and weaknesses of the Derivative Actions, and other issues in an effort to facilitate negotiations; (12) analyzing the Court's order granting and denying in part Defendants' motions to dismiss and considering relevant points to move for reconsideration; (13) researching the Company's corporate governance structure in connection with settlement efforts; (14) preparing comprehensive written settlement demands and modified demands over the course of the Parties' settlement negotiations;

(15) preparing a mediation statement; (16) participating in the full-day Mediation, in person; (17) negotiating and drafting settlement papers and moving for preliminary and final approval of the Settlement; and (18) subsequently moving for final approval of settlement.

65.    Based on the daily time records maintained by my firm, the Brown Law Firm's attorneys and professional staff recorded 1,094.5 hours of time in connection with the derivative litigation from the commencement of the California Action and the Delaware Chancery Action (including pre-litigation research and investigation) through September 3, 2024 (the date the Court entered the Preliminary Approval Order). We have incurred additional time thereafter in connection with the settlement approval process.

66.    The lodestar amount for attorney and professional time based on my firm's current rates is $789,382.50 through September 3, 2024. The hourly rates shown below are the usual and customary rates charged in all of our cases.

67.    The chart below summarizes the hours, hourly rates, and lodestar of each Brown Law Firm professional who worked on this matter, through September 3, 2024:

| NAME | POSITION[6] | HOURS | RATE | TOTAL |
|---|---|---|---|---|
| Timothy Brown | P | 238.5 | $975 | $232,537.50 |
| Saadia Hashmi | P | 469.2 | $750 | $351,900.00 |
| Elizabeth Donohoe | A | 120.9 | $600 | $72,540.00 |
| John Coyle IV | A | 34.3 | $575 | $19,722.50 |
| Sawyer White | A | 6.6 | $600 | $3,960.00 |
| Ben Wedeking | A | 42.7 | $625 | $26,687.50 |
| Andrew Xiong | LC | 182.3 | $450 | $82,035.00 |
| TOTAL HOURS | | 1,094.5 | TOTAL LODESTAR | $789,382.50 |

68.    The Brown Law Firm's time report reflects time recorded contemporaneously and then compiled in the firm's electronic time-keeping system. It

---

[6]    (P) Partner; (A) Associate; (LC) Clerk.

reflects reductions I made in the exercise of reasonable billing judgement. Among other reductions, my firm's reported time does not include any time spent exclusively on negotiations concerning attorneys' fees, and I excluded all time incurred by individuals at my firm who billed less than five hours to the case. I supervised and worked directly with the attorneys and other professional staff who billed time to this matter. Having carefully reviewed their time records, I can aver that the hours reported and the work they reflect were reasonably necessary to the prosecution and settlement of the litigation. The hourly rates shown in the chart in ¶ 67 above are the usual and customary rates charged for each individual biller. These rates are set based on market rates for attorneys of comparable skill and experience, and they have been approved by federal and state courts throughout the nation.

69. In this case, as in every case I lead for my firm, I did my best to allocate work in an efficient and effective manner, taking into account the needs of the case and the appropriateness of tasks for partners, associates, and professional staff.

70. The Brown Law Firm's firm resumé, which details the background and experience of the attorneys who principally participated in the prosecution of this action, is attached as Exhibit 1.

71. The Brown Law Firm has made every effort to limit expenses and to use the most efficient means available for accomplishing tasks for which expenses were incurred. Based on records maintained by my firm, the total unreimbursed expenses incurred by The Brown Law Firm with respect to the litigation from inception to date are $19,868.24.

72. My firm's unreimbursed expenses, broken down by category, are as follows:

| CATEGORY | TOTAL |
|---|---|
| Fees in This Court and the Delaware Court of Chancery | $3,118.20 |
| Copies | $812.43 |
| Courier | $140.00 |
| Service of Process | $191.10 |
| Mediation Fees | $5,625.00 |

DECLARATION OF TIMOTHY BROWN IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTIONS FOR
FINAL APPROVAL OF SETTLEMENT AND FOR ATTORNEYS' FEES,
REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS

| CATEGORY | TOTAL |
|---|---|
| Legal Research | $1,663.50 |
| Transportation, Hotels, and Meals | $8,278.15 |
| Conference Calls & Mobile Phone Fees | $39.86 |
| **TOTAL EXPENSES** | **$19,868.24** |

73.    These expenses are reflected in records maintained by my firm in the ordinary course of business, which are prepared from expense vouchers, invoices, and other billings records submitted contemporaneously as they are incurred and include travel expenses in connection with attending the Settlement Hearing.  I have reviewed the expense records in detail and can aver that they were reasonably necessary for the effective and efficient prosecution and resolution of the Derivative Actions and are reasonable in amount.

74.    Compensation for my firm for services rendered and out-of-pocket expenses incurred in this case was and is entirely contingent on the success of the litigation in providing Faraday a substantial benefit, and on the Court's approval of the separately negotiated attorneys' fees and expenses. None of the attorneys' fees and expenses submitted to this Court have been paid from any source or have been the subject of any prior request or prior award in any litigation or other proceeding.

(b)    *Plaintiffs' Counsel's Collective Time, Expenses, and Lodestar*

75.    As set forth in the chart below, Plaintiffs' Counsel devoted a total of 2,002.9 hours to the Derivative Action from inception through September 3, 2024. *See* ¶ 67, above & Exs. 2-5. The hours expended were necessary and reasonable and were spent on tasks that directly led to the recovery here. *See* ¶ 68, above & § V(A), above. As set forth in the accompanying declarations, Plaintiffs' Counsel's hourly rates are reasonable, have been regularly approved, and are in line with the current market rate for lawyers litigating similar complex actions. *See* ¶ 68, above & Exs. 2-5.

DECLARATION OF TIMOTHY BROWN IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTIONS FOR
FINAL APPROVAL OF SETTLEMENT AND FOR ATTORNEYS' FEES,
REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS

| FIRM NAME | HOURS | LODESTAR | EXPENSES |
|---|---|---|---|
| The Brown Law Firm, P.C. | 1,094.5 | $789,382.50 | $19,868.24 |
| Gainey McKenna & Egleston | 205.55 | $156,182.25 | $4,601.70 |
| Hynes & Hernandez, LLC | 289.7 | $243,900.00 | $2,755.90 |
| Bragar Eagel & Squire, P.C. | 172.75 | $126,126.25 | $1,145.88 |
| Schubert Jonckheer & Kolbe LLP | 240.4 | $199,947.50 | $7,920.98 |
| **TOTALS** | **2,002.9** | **$1,515,538.50** | **$36,292.70** |

76.    A lodestar cross-check is unnecessary because Plaintiffs' Counsel base their fee request on the substantial settlement benefits achieved and because the Fee and Expense Award plainly would not confer a windfall. Regardless, a cross-check confirms the reasonableness of the agreed-to amount. Plaintiffs' Counsel's total lodestar from inception through September 3, 2024 is $1,515,538.50. *See* ¶¶ 67,75, above & Exs. 2-5. After deducting Plaintiffs' Counsel's combined expenses, the net fee award sought by Plaintiffs' Counsel is $738,707.30. This represents a fractional multiplier of 0.49 on Plaintiffs' Counsel's total lodestar of $1,515,538.50, well within the range deemed reasonable by courts in this and other circuits. Indeed, a multiplier of less than one (sometimes called a negative multiplier) is a strong indication of the reasonableness of the proposed fee under applicable case law.

v.    <u>Public Policy Supports the Agreed-To Fee and Expense Amount</u>

77.    Plaintiffs' Counsel's efforts produced substantial benefits for Faraday and its stockholders. This would not have been possible without adequate incentives for skilled and experienced counsel to focus their practice on high-risk stockholder derivative litigation. Approval of the negotiated Fee and Expense Award will further the public policy of encouraging meritorious lawsuits by shareholders to protect the interests of corporations from malfeasance on the part of its executives and/or directors.

## VII.   THE PROPOSED SERVICE AWARDS ARE JUSTIFIED AND REASONABLE

78.    In recognition of the Plaintiffs' important role in securing the substantial Settlement benefits for Faraday and its stockholders, we seek the Court's approval to pay

each of them nominal service awards of $2,000 from the Fee and Expense Amount. Defendants do not oppose this request. *See* Stip., § V, ¶ 4.4. The proposed awards are well within the range generally approved by courts, and because they will be paid from the Fee and Expense Amount, they will not reduce the value or benefits secured for the Company.

79.     Additionally, my clients, Plaintiffs Farazmand and Zhou stayed actively involved in this litigation. Plaintiffs Farazmand and Zhou reviewed and authorized the filing of the initial and amended stockholder derivative complaints in the California Action and separately, the Delaware Chancery Action, respectively, and was available for updates on the litigation, including regarding the proposed Settlement. Given their participation and the favorable benefits achieved for Faraday through the settlement, I believe that a service award of $2,000, each, for Plaintiff Farazmand and Plaintiff Zhou (as well as to each Plaintiff in the Derivative Actions), to be deducted from Plaintiffs' Counsel's Fee and Expense Amount, is warranted and appropriate.

## VIII. CONCLUSION

80.     The proposed Settlement is a fair compromise of the issues in dispute.  After weighing the benefits of this Settlement against the uncertainty and risks of continued litigation, the Parties believe that the proposed Settlement is fair, reasonable, and adequate and warrants final approval.  Therefore, I respectfully request that the Court enter the [Proposed] Order and Final Judgment approving the proposed Settlement and dismissing the Actions with prejudice.

81.     Attached hereto are true and correct copies of the following exhibits:

Exhibit 1:   The Brown Law Firm, P.C. firm resume;

Exhibit 2:   Declaration of Thomas J. McKenna filed on behalf of Gainey McKenna & Egleston in support of Plaintiffs' Unopposed Motion for Attorneys' Fees, Reimbursement of Expenses, and Service Awards & Exhibit 1 (Gainey McKenna & Egleston firm resume);

Exhibit 3:   Declaration of Ligaya T. Hernandez filed on behalf of Hynes & Hernandez, LLC in support of Plaintiffs' Unopposed Motion for

31

Attorneys' Fees, Reimbursement of Expenses, and Service Awards &
Exhibit A (Hynes & Hernandez, LLC firm resume);

Exhibit 4:    Declaration of Melissa A. Fortunato filed on behalf of Bragar, Eagel
& Squire P.C. in support of Plaintiffs' Unopposed Motion for
Attorneys' Fees, Reimbursement of Expenses, and Service Awards &
Exhibit A (Bragar, Eagel & Squire P.C. firm resume);

Exhibit 5:    Declaration of Willem F. Jonckheer filed on behalf of Schubert
Jonckheer & Kolbe LLP in support of Plaintiffs' Unopposed Motion
for Attorneys' Fees, Reimbursement of Expenses, and Service Awards
& Exhibit A (Schubert Jonckheer & Kolbe firm resume);

Exhibit 6:    L. Bebchuk & A. Hamdani, *The Elusive Quest for Global
Governance Standards*, 157 U. Pa. L. Rev. 1263 (2009);

Exhibit 7:    Robert Adamson, *Corporate Governance, Risk Management and
Corporate Social Responsibility in Emerging Markets: A Symbiotic
Relationship*, Corporate Governance & Risk Management Blog,
Simon Fraser University, Beedie School of Business (Mar. 22, 2011);

Exhibit 8:    P. Gompers, J. Ishii & A. Metrick, *Corporate Governance and Equity
Prices*, 118 Quarterly J. Econ. (2003);

Exhibit 9:    Lawrence D. Brown & Marcus L. Caylor, *The Correlation Between
Corporate Governance and Company Performance*, Institutional
Shareholder Services (2004);

Exhibit 10:   V. Cunant, M. Gina & M. Guadalupe, *The Vote Is Cast: The Effect of
Corporate Governance on Shareholder Value*, 67 J. Finance 68 (Oct.
2012);

Exhibit 11:   *McKinsey & Company Investor Opinion Survey*, McKinsey &
Company (June 2000);

Exhibit 12:   *In re Zuora, Inc. Derivative Litig.*, Case No. 3:19-cv-05701-SI, Final
Order and Judgment (N.D. Cal. Sept. 18, 2023);

Exhibit 13:   Stipulation and Agreement of Settlement filed in *In re Zuora, Inc.
Derivative Litig.*, Case No. 3:19-cv-05701-SI (N.D. Cal.) dated May
9, 2023;

Exhibit 14:   Stipulation of Settlement filed in *In re RTI Surgical Derivative Litig.*,
Case No. 1:20-cv-03347 (N.D. Ill.) dated September 10, 2021;

DECLARATION OF TIMOTHY BROWN IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTIONS FOR
FINAL APPROVAL OF SETTLEMENT AND FOR ATTORNEYS' FEES,
REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS

Exhibit 15:   *In re Cell Therapeutics, Inc. Derivative Litig.*, Case No. 2:10-cv-00564-MJP, Final Judgment and Order of Dismissal (W.D. Wash. May 31, 2013);

Exhibit 16:   Stipulation of Settlement filed in *In re Cell Therapeutics, Inc. Derivative Litig.*, Case No. 2:10-cv-00564-MJP (W.D. Wash.) dated November 6, 2012;

Exhibit 17:   *In re Inovio Pharms. Derivative Litig.*, Case No. 2:20-cv-01962-GJP, Order and Final Judgment (E.D. Pa. Oct. 11, 2023);

Exhibit 18:   Stipulation and Agreement of Settlement filed in *In re Inovio Pharms. Derivative Litig.*, Case No. 2:20-cv-01962-GJP (E.D. Pa.) dated March 31, 2023;

Exhibit 19:   *In re RH S'holder Derivative Litig.*, Case No. 4:18-cv-02452-YGR, Order and Final Judgment (N.D. Cal. Dec. 18, 2020) (attaching Stipulation of Settlement dated June 17, 2020);

Exhibit 20:   *In re Babcock & Wilcox Enters., Inc. S'holder Derivative Litig.*, Case No. 3:18-cv-00347-MOC-DCK, Order (W.D.N.C. Dec. 19, 2019);

Exhibit 21:   Stipulation and Agreement of Settlement filed in *In re Babcock & Wilcox Enters., Inc. S'holder Derivative Litig.*, Case No. 3:18-cv-00347-MOC-DCK (W.D.N.C.) dated July 22, 2019;

Exhibit 22:   *In re Synchrony Fin. Derivative Litig.*, Case No. 3:19-cv-00130-VAB, Ruling and Order Approving Shareholder Derivative Settlement (D. Conn. Apr. 5, 2024); and

Exhibit 23:   Stipulation and Agreement of Settlement filed in *In re Synchrony Fin. Derivative Litig.*, Case No. 3:19-cv-00130-VAB (D. Conn.) dated December 12, 2023.

I declare under penalty of perjury that the foregoing representations are true and correct. Executed this 7th day of October, 2024, at New York, New York.

Timothy Brown

33